WAFFLE HOUSE, INC., Appellant,

v.

Cathie WILLIAMS, Appellee.

No. 2–05–373–CV.

Court of Appeals of Texas,
Fort Worth.

Feb. 1, 2007.

Fulbright & Jaworksi L.L.P., W. Wendell Hall, Mark Emery, San Antonio, for Appellant.

Foreman, Lewis & Hutchison, P.C., Susan Hutchison, Kern Lewis, Grapevine, for Appellee.

PANEL B: DAUPHINOT, GARDNER, and McCOY, JJ.

## MEMORANDUM OPINION [1]

LEE ANN DAUPHINOT, Justice.

Waffle House, Inc. appeals from a jury verdict finding that its employee sexually harassed Appellee Cathie Williams, a former Waffle House employee, that Waffle House's negligence in "supervising and/or retaining" the employee proximately caused damage to Williams, and that Waffle House constructively discharged Williams by an official action. In four issues, Waffle House argues that the jury's findings of negligent supervision and retention cannot support the judgment; that Williams's alternative trial theories have been abandoned, or, alternatively, the evidence is legally and factually insufficient to support the jury's findings of sexual harassment and constructive discharge; that Waffle House is entitled to a new trial because the trial court abused its discretion by excluding evidence and because of newly discovered evidence; and that there is no legally or factually sufficient evidence to support the jury's findings that Waffle House acted maliciously or with reckless indifference toward Williams. We affirm.

### FACTS AND PROCEDURAL HISTORY

Williams began working at Waffle House Unit 206 on July 5, 2001. She worked the third shift, from 9 p.m. to 7 a.m. During Williams's employment with Waffle House, she had a number of different managers. Ossie Ajene was the store manager at the time of her hiring, and T.J. Marshall was the district manager. In December 2001, Kevin Love replaced Ajene as the store manager. Allen Conley replaced Marshall as the district manager in January 2002. Kevin Ross was the division manager (manager over the district managers) at that time. Managers did not usually work the third shift but were available by telephone at all hours and regularly came in during the night to handle problems.

Within Williams's first week of work, employee Eddie Davis, a cook, began making sexual comments to her. Davis looked her up and down and then told her that she "looked like [his] baby's mama" and that she "had a fine ass for a white woman." When Williams walked by Davis, he would push her into counters and into the grill. Davis asked Williams if she "ever had the flavor of a black man." Williams testified that when Davis made the remark, he had his hands down his pants. At one point, while Williams waited on customers, Davis came up behind her, held her arms, held his whole body against hers close enough to breathe on her neck, and said, "Isn't she great? Isn't she wonderful?," to the customers. Davis cornered

1. See TEX.R.APP P. 47.4.

her on several other occasions as well. When Williams would reach up to put plates on a shelf above head level, Davis would put his arm up and rub against her breast. On one occasion, Williams went to the back room, where the lights were off, to get salad supplies. As she began to leave, Davis stood in front of her with his arm up on the freezer door, blocking her exit. When she requested that he move, he just chuckled. She had to duck under his arm to leave the room. On another occasion, when Davis was at the restaurant after his shift, he showed Williams a condom and laughed. He would frequently stare at her when he was in the restaurant while off duty.

There were no complaints from other employees about sexual remarks or behavior by Davis. No other employee witnessed the incidents with Williams.

Williams told store manager Ajene of Davis's behavior. Williams testified that when she told Ajene about Davis's conduct, he laughed and told her that "it doesn't sound like Eddie." Waffle House claimed that Ajene first heard of the complaint from coworker Bobbie Griffith, who had heard about it from Williams but had not witnessed the behavior. Ajene spoke to Davis, who denied the allegations. Ajene testified at trial that when he spoke to Davis, he was not sure specifically what Williams's complaint against Davis consisted of because Williams would not talk about it with him. Ajene nevertheless moved Davis to the second shift. Ajene testified that he then kept his eyes open for any problems between Davis and Williams during the shift change. During the nearly eight months after Davis moved shifts, Williams and Davis rarely worked together, with shift overlaps totaling approximately 18.5 hours during that time. But Davis was still at the restaurant many times when not on the clock, eating meals and picking up his pay. Davis's replacement on the third shift was his roommate, with whom Davis shared a car, and Davis often spent time at the restaurant after his shift.

Williams also discussed the issue with district manager Marshall. Marshall spoke with Davis about Williams's allegations, and again Davis denied them. Waffle House provides an employee complaint hotline as part of its sexual harassment policy. The hotline allows employees to report complaints to corporate management without going through lower-level managers. Marshall attempted to call the hotline for Williams, who said that she had tried to use the hotline before but worried she had not dialed correctly. The parties dispute whether Marshall accidentally called the wrong number and left a message on the company's workers' compensation hotline, or whether the complaint was made to the correct number but not acted upon by corporate management.

Williams reported the harassment to Love after he replaced Ajene. Love told Davis that he would not tolerate sexual harassment, and he told Griffith to report back to him if she saw any incident between Williams and Davis. District manager Conley, who had replaced Marshall, told Williams to write him a letter documenting her claims, which she did. Conley reported Williams's claim to Ross, the divisional manager. Waffle House corporate management denies ever receiving Williams's letter, and Conley could not remember exactly to whom he gave the letter.

Williams claimed that Waffle House did nothing to determine if the behavior was ongoing or if Davis was retaliating against her. Williams's last day of work was February 24, 2002; the next week, when Williams was scheduled to work, her husband called and resigned for her.

Williams then filed complaints with the Equal Employment Opportunity Commission and the Texas Commission on Human Rights ("TCHR"), seeking permission to sue. The EEOC and the TCHR each issued a right to sue notice.

Williams filed suit in Tarrant County alleging sexual harassment under the Texas Labor Code,[2] as well as common law claims of assault and battery, ratification, and negligent supervision and retention. She further alleged that Waffle House acted with reckless indifference with respect to the statutory sexual harassment claim and willfully or maliciously with respect to the common law claims. She also claimed exemplary damages.

Davis could not be found at the time of trial, and he was nonsuited. At trial, Waffle House attempted to introduce a chart that summarized the number of hours that Williams and Davis worked together during Williams's time at Waffle House. The trial court excluded the chart. The trial court also granted Williams's motion in limine prohibiting Griffith from testifying about any sexual comments that Williams made in the workplace and excluded portions of Griffith's deposition testimony from evidence.

Williams testified that Davis's harassment caused her to have shortness of breath and to feel afraid and helpless. She said that she could not sleep and had trouble eating, and her hair started falling out. She stated that she had to take medication to help with her anxiety and depression.

Williams's husband testified that after she started working at Waffle House, she became sleepless and restless, began having nightmares, and began grinding her teeth. Williams's attorneys referred her to Dr. C. Ewing Cooley, a psychologist and therapist, who began treating Williams and who testified about her mental condition. He testified that Williams had recurring anxiety and was experiencing fear and anger. Dr. Cooley testified that Williams's experiences with Davis exacerbated the posttraumatic stress disorder she suffered from as a result of her stepfather sexually abusing her as a child. Waffle House argued that Williams's emotional and physical symptoms resulted from a series of events that she experienced in a short period of time: her stepfather had recently been released from prison and had previously threatened to kill Williams and her stepsister for testifying against him; Williams's son had ongoing heart problems that had required multiple surgeries, and he had been having problems at school; because of her son's difficulties, Williams had been home-schooling him while working at Waffle House and she and her husband were engaged in another lawsuit, in which they were suing for emotional distress, due to problems with their mobile home.

In a 10–2 verdict, the jury found Waffle House liable on some of Williams's claims. The jury found that Davis had sexually harassed Williams, that Davis had assaulted Williams, and that Waffle House's negligence in supervising Davis, retaining him, or both proximately caused damage to Williams. The jury also found that Waffle House constructively discharged Williams by an official action. The jury did not find that Waffle House ratified Davis's assault or that Waffle House retaliated against Williams for making her sexual harassment complaint. The jury awarded her $400,000 in past compensatory damages, $25,000 in future compensatory damages, and $3,460,000 in punitive damages. The trial court entered a final judgment for

2. TEX. LAB.CODE ANN. §§ 21.051, 21.055 (Vernon 2006).

Williams for $400,000 in past compensatory damages, $53,201.09 in prejudgment interest, $25,000 in future compensatory damages, $425,000 in punitive damages (lowered due to the general cap on punitive damages), $4,728.60 in costs, and post-judgment interest at five percent.

After trial, a former Waffle House employee, Lisa Stone, called the Waffle House legal department after reading a newspaper article about the verdict and disclosed conversations she had had with Williams at work in which Williams allegedly openly discussed her sexual preferences and sexual conduct.

Waffle House filed a motion for a new trial and, alternatively, a suggestion of remittitur of damages, and a motion for judgment notwithstanding the verdict, and after these motions were denied, a notice of appeal.

## ANALYSIS

### Negligent Supervision and Retention Claim

 The first issue on appeal is whether the jury's findings of negligent supervision and retention can support the judgment. Waffle House first argues that there is no legally or factually sufficient evidence to support the jury's finding of negligent supervision and retention. Alternatively, Waffle House argues that the trial court erred by failing to instruct the

jury on "damages." A legal sufficiency challenge may only be sustained when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.[3] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.[4]

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.[5] We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.[6]

 A claim of negligent supervision or negligent retention is based on the employer's direct negligence, not the employer's vicarious liability.[7] An employer is therefore not liable for an employee's conduct under a negligent supervision or a negligent retention theory unless the employer owed a duty to the injured party,[8]

3. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960).

4. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

5. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

6. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

7. *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 49 (Tex.App.-Fort Worth 2002, no pet.); *Estate of Arrington v. Fields*, 578 S.W.2d 173, 178 (Tex.Civ.App.-Tyler 1979, writ ref'd n.r.e.).

8. *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953–54 (Tex.1996).

the employer's negligence proximately caused the injury,[9] and the employee committed an actionable tort.[10] Waffle House does not dispute that its employer-employee relationship with Davis created a duty on its part to control Davis's conduct or that it had a duty to adequately hire, train, and supervise its employees.[11] Nor does Waffle House dispute that the negligent performance of those duties imposes liability on Waffle House if Williams's injuries resulted from Waffle House's failure to take reasonable precautions to protect her from Davis's misconduct.[12] Waffle House does contend that Williams failed to produce legally or factually sufficient evidence of a breach of duty or of causation.

We first consider whether the evidence presented at trial was legally and factually sufficient to support a finding of breach of duty. Williams testified that within her first week of work, Davis began making unwanted sexual comments to her. Ajene learned of Williams's problems with Davis and spoke to Davis, who denied the allegations. Ajene moved Davis to the second shift but did not call the company hotline and did not take any steps to ensure that Davis did not interact with Williams in the restaurant when Davis was not working. Ajene testified that he then kept his eyes open for any problems between Davis and Williams during the shift change, but Ajene did not conduct an investigation of Williams's complaints, other than his initial conversation with Davis. Williams testified that Ajene told her he wanted to handle the situation in-house and did not want her to call the hotline.

District manager Marshall spoke with Davis about Williams's allegations, and again Davis denied them. Marshall attempted to call the hotline for Williams. He did not conduct an investigation of Williams's complaints, did not follow up with Williams to determine if any investigation had been made by Waffle House's corporate management, and did not ensure that Davis and Williams would have no interaction in the restaurant.

When Love replaced Ajene, Williams made her complaints to him. Love told Davis that he would not tolerate sexual harassment. He did not investigate the complaints and did not investigate as to whether problems were continuing. He also did not attempt to ensure that Davis did not interact with Williams in the unit. In fact, when Williams complained to him that she was still encountering Davis at work, he told her that there was no way to structure their shifts so as to avoid her coming into contact with Davis as long as they were both employed at the same restaurant. He did not call the hotline as required under Waffle House policy. He did report to Marshall, his district manager. Marshall told Love that he (Marshall) would look into the matter, but Love never followed up to determine if Marshall had investigated the matter or what he was doing to take care of the situation. When Conley replaced Marshall as Love's district manager, Love did not talk to him about the situation.

Conley also did not attempt to ensure that Williams and Davis had no interaction in the restaurant. In his deposition, he

**9.** *Dieter v. Baker Serv. Tools,* 739 S.W.2d 405, 408 (Tex.App.-Corpus Christi 1987, writ denied).

**10.** *Gonzales v. Willis,* 995 S.W.2d 729, 739 (Tex.App.-San Antonio 1999, no pet.).

**11.** *See Mackey v. U.P. Enters., Inc.,* 935 S.W.2d 446, 459 (Tex.App.-Tyler 1996, no writ); *Garcia v. Allen,* 28 S.W.3d 587, 592 (Tex.App.-Corpus Christi 2000, pet. denied); *Castillo v. Gared, Inc.,* 1 S.W.3d 781 (Tex. App.-Houston [1st Dist.] 1999, pet. denied).

**12.** *See Garcia,* 28 S.W.3d at 592.

stated that he believed that he had called the hotline, but at trial he stated that he did not remember calling the hotline. He did not interview Davis or ask him for a statement. In his testimony, Conley could not be sure what he did with the letter he asked Williams to write or whom he gave it to.

Although a call was made to a Waffle House hotline, no investigation was ever made of Williams's complaints. Even if Williams called the wrong number, she had reported her complaint to four different managers—once in writing—and the evidence shows that none of the managers conducted a sufficient investigation[13] of her complaints, ascertained whether Waffle House corporate management was investigating the complaints, followed up with Williams as to whether the complaints were being investigated or whether the problems were ongoing, or ensured that Williams and Davis would have no interaction on the work premises. No attempt was made by the managers to supervise Davis when he was in the store off-duty to prevent the type of behavior that Williams reported. Waffle House retained Davis as an employee despite Williams's complaints and without sufficiently investigating to determine whether her complaints had merit.

▮▮ Under Texas law, an employer may be liable to a plaintiff for negligent supervision if the plaintiff's injuries result from the failure of the employer to take reasonable precautions to protect the plaintiff from the misconduct of its employees.[14] Waffle House urges us to apply *Mackey v. U.P. Enterprises, Inc.* and cites that case for the proposition that because Waffle House had corporate policies regarding sexual harassment, it took reasonable precautions to prevent Williams from the misconduct of its employees, and therefore as a matter of law there is no evidence of breach of duty. Waffle House thus claims that an employer cannot be held liable if it puts in place a policy to prevent the kind of harm Williams suffered but then fails to follow the policy. We do not read *Mackey* for the proposition that an employer's duty to its employees ends with putting in place reasonable precautions to prevent harm, such that an employer can escape liability when it learns that an employee is engaging in the kind of behavior the precautions were designed to prevent, yet the employer fails to act. Such an interpretation would fly in the face of the law on negligent retention, under which an employer is liable if it retains an incompetent employee whom the employer knows was incompetent or unfit, "thereby creating an unreasonable risk of harm to others,"[15] and the plaintiff's injuries are the result of the employer's continued employment of the incompetent or unfit employee.[16]

We also find *Mackey* to be distinguishable from this case. In *Mackey*, the plain-

**13.** *See Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 474 (Tex.App.-Austin 2000, pet. denied) (holding that the jury could reasonably infer from the evidence that a manager's investigation was pretextual, or at least insufficient, given the gravity of the plaintiff's allegations, where the manager's investigation consisted of talking to the plaintiff, the object of her complaints, and two other employees, after which manager did not believe he had enough facts but did not conduct any further investigation).

**14.** *Mackey,* 935 S.W.2d at 459; *see also Dieter,* 739 S.W.2d at 408.

**15.** *Leake v. Half Price Books, Records, Magazines, Inc.,* 918 S.W.2d 559, 563 (Tex.App.-Dallas 1996, no writ); *Estate of Arrington,* 578 S.W.2d at 178.

**16.** *Leake,* 918 S.W.2d at 563; *Estate of Arrington,* 578 S.W.2d at 178; *Dieter,* 739 S.W.2d at 408.

tiff employee sued her employer, U.P. Enterprises, owner of the Taco Bell franchise where she worked, on grounds that her managers sexually harassed her. Mackey alleged that UPE failed to monitor the supervisory practices of the managers who sexually harassed her, "failed to detect or take action to deter the alleged sexual harassment," and "failed to implement and monitor procedures for handling grievances."[17] UPE moved for summary judgment and presented evidence that it had a written policy against sexual harassment, that it trained its managers on the policy twice a month, and that corporate supervisors visited each store daily.[18] The trial court granted summary judgment, and Mackey appealed.[19] The court of appeals held that in order to avoid summary judgment, Mackey would have had to present evidence specifying UPE acts or omissions that supported her allegations or that otherwise controverted UPE's summary judgment evidence.[20] Because Mackey presented no such evidence, the summary judgment was affirmed.

▇ In the instant case, Williams alleged that (1) Waffle House managers negligently supervised and negligently retained an employee that Waffle House had reason to know was violating its company policies and (2) Waffle House did not follow its own policies regarding sexual harassment and the investigation of sexual harassment complaints. Specifically, Williams's petition alleged that it was foreseeable that she would be harmed if Waffle House retained Davis and if Waffle House failed to properly supervise Davis. She alleged that Waffle House knew or should have known that Davis was incompetent or unfit for retention, that he would continue to come into contact with Williams during her working hours and, based upon Williams's complaints, that this would create a risk of harm to her. She further alleged that Waffle House would have made such a determination had it performed an investigation in keeping with its own corporate policies. Williams then presented evidence supporting these claims at trial. *Mackey* is therefore distinguishable from this case.

▇ The evidence presented at trial showed that Waffle House did not conduct a sufficient investigation given the gravity of Williams's complaints, did not follow its own procedures for investigating such complaints, did not take reasonable precautions to prevent interaction between Williams and Davis in the restaurant,[21] and retained an employee it had reason to know was unfit, all of which was some evidence of breach of duty by Waffle House.[22] We therefore hold that the evidence was legally sufficient on this element. Additionally, we hold that the evidence was factually sufficient because we

17. *Mackey*, 935 S.W.2d at 459.

18. *Id.* at 459–60.

19. *Id.* at 460.

20. *Id.*

21. *See Loram Maint. of Way, Inc. v. Ianni*, 2006 WL 1791692, *2 (Tex.2006) (stating that the employer-employee relationship can give rise to a legal duty on the part of the employer to control the conduct of its employee and as such an employer may be liable for off-duty torts of its employees that are committed on the employer's premises); *see also Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983).

22. *Compare Kendall v. Whataburger, Inc.*, 759 S.W.2d 751, 757 (Tex.App.-Houston [1st Dist.] 1988, no pet.) (holding evidence was sufficient to support jury's finding that the employer was not negligent where the employee "had never given [the employer] any indication of one day becoming a problem employee").

cannot say that the evidence supporting a finding of breach of duty was so weak or the evidence to the contrary so overwhelming that the jury's answer should be set aside. Waffle House also argues that the evidence was insufficient to support a finding of proximate cause. We disagree. Proximate cause consists of both cause in fact and foreseeability.[23] Cause in fact is an act or omission that is a substantial factor in bringing about the injury, without which the injury would not have occurred.[24] The element of foreseeability is met if "a person of average intelligence should have anticipated" that the act or omission would create a danger to others.[25] Proximate cause is a question of fact "particularly within the province of a jury"; "a jury finding on proximate cause will be set aside only in the most exceptional circumstances." [26]

According to Williams's testimony at trial, because of her experiences at Waffle House, she began having nightmares about Waffle House management. She has trouble sleeping at night because she "hears things," and she has to get up to check on her children out of fear that something is going to happen to them. She began grinding her teeth at night, causing them to chip, and she now must wear an occlusal guard at night. Her hair started falling out, and she testified that she had never experienced hair loss before her experience at Waffle House. She testified that because of Davis's conduct, she cannot be alone in a dark room and becomes panicked in crowds and elevators. She began taking medication to cope with her anxiety and depression. She has been in therapy for several years now to deal with her anxiety resulting from her experience at Waffle House.

Waffle House contends that the presence of other stressors in Williams's life is fatal to her claim because Williams presented no testimony as to what percentage of her stress was caused by any acts of Waffle House. Waffle House attempts to characterize Dr. Cooley's testimony as an admission that Williams's damages were caused by other stressors rather than by any acts or omissions of Waffle House. Dr. Cooley did state that he could not specify what exact percentage of her stress was caused by her stepfather's sexual abuse and what exact percentage was caused by her treatment at Waffle House. But Dr. Cooley further testified that he was not aware that anyone could specifically parcel out into percentages the cause of mental anxiety and the accompanying physical injuries. He also further testified that he understood that she had been coping with her childhood experiences until her experiences at Waffle House. Accordingly, we do not regard Dr. Cooley's testimony as an admission that Waffle House's negligence did not cause injury to Williams. Further, the jury apparently did not find credible Waffle House's arguments that Williams's injuries resulted from other stressors in her life. The jury did believe Williams's evidence that she was capably dealing with other stressors in her life and that it was her experience at

**23.** *Clark v. Waggoner,* 452 S.W.2d 437, 439 (Tex.1970); *Lawrence v. City of Wichita Falls,* 122 S.W.3d 322, 329 (Tex.App.-Fort Worth 2003, pet. denied).

**24.** *Morris,* 78 S.W.3d at 50.

**25.** *Waggoner,* 452 S.W.2d at 439; *Lawrence,* 122 S.W.3d at 329.

**26.** *Tex. Dep't of Transp. v. Olson,* 980 S.W.2d 890, 893 (Tex.App.-Fort Worth 1998, no pet.) (quoting *Potter v. Anthony Crane Rental of Tex., Inc.,* 896 S.W.2d 845, 850 (Tex.App.-Beaumont 1995, writ denied)).

Waffle House that triggered her negative reactions.

Texas law is well settled that a tortfeasor takes a plaintiff as he finds her.[27] Williams was therefore entitled to recover the damages resulting to her from Waffle House's breach, "conditioned as [she] was at the time of the injury, and not such damages as [she] might have been entitled to had [her] condition been different."[28] Even if other stressors in Williams's life made her more susceptible to injury from Waffle House's negligence, that fact "cannot affect the question of right to or measure of damages."[29]

We note that Waffle House appears to be asking us to hold that a plaintiff must present expert testimony proving sole proximate cause when alleging damages from negligence. Such a rule is clearly not the law in Texas. Rather, Texas law allows that there may be more than one proximate cause of an injury, and "all persons whose acts contributed to the injury are liable therefor, and the negligence of one does not excuse the negligence of the other."[30] We therefore are unpersuaded by Waffle House's arguments.

Waffle House cites *Castillo v. Gared, Inc.*,[31] for the proposition that an act that may furnish a condition that makes an injury possible does not constitute proof of causation. *Castillo* does not control our holding. In *Castillo*, a security company provided security services for a motel.[32] The company's policy permitted the security guard to enter a guest's room to investigate a disturbance without being accompanied by another person, which the court held furnished a condition that made rape possible but did not make it foreseeable.[33] The company did not know and had no reason to anticipate that the security guard in question would rape a guest.[34] In this case, Waffle House did more than assign two employees to the same shift, furnishing a condition that made possible the assault of one employee by the other. After Waffle House was notified multiple times of problems between the two employees, it failed to sufficiently investigate or take adequate steps to prevent the kind of harm it knew or should have known could result from the continued interaction of the two employees. This is at least some evidence, more than a scintilla, of negligent supervision and retention.

We believe that the evidence presented to the jury was legally sufficient to support the jury's answer as to causation; there was ample evidence that at least some of the damage to Williams was caused by Waffle House's negligence and that her existing problems were exacerbated by her experiences at the restaurant. Further, we hold that the evidence was factually sufficient because we cannot say that the evidence that Williams suffered damages from the negligence of Waffle House was so weak or the evidence to the contrary so overwhelming that the jury's answer on damages should be set aside and a new trial ordered. Accordingly, because the

**27.** *Coates v. Whittington*, 758 S.W.2d 749, 752–53 (Tex.1988); *Driess v. Friederick*, 73 Tex. 460, 462, 11 S.W. 493, 494 (1889).

**28.** *See Driess*, 11 S.W. at 494.

**29.** *See id.*

**30.** *Strakos v. Gehring*, 360 S.W.2d 787, 794 (Tex.1962); *see also Olson*, 980 S.W.2d at 893.

**31.** 1 S.W.3d 781 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

**32.** *Id.* at 783.

**33.** *Id.* at 786.

**34.** *Id.* at 787.

evidence is legally and factually sufficient and we find no exceptional circumstances in this case, we uphold the jury's finding on proximate cause.[35]

■ Alternatively, Waffle House argues that the trial court erred by failing to instruct the jury that "damages" in negligence cannot arise from conduct that amounts to statutory sexual harassment. Williams counters that Waffle House failed to preserve this argument for appeal. We agree.

■ To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection, or motion.[36] If a party fails to do this, error is not preserved, and the complaint is waived.[37] When complaining of an error in the jury charge, the objecting party must timely and plainly make the trial court aware of the complaint and obtain a ruling.[38]

During the charge conference, Waffle House did object that "damage" needed to be defined, but in an ambiguous manner. Waffle House did not plainly make the trial court aware of Waffle House's complaint on appeal that the jury needed to be instructed that it could not base damages for negligent supervision and retention on a finding of sexual harassment by Davis. When discussing the compensatory damages jury question, the parties argued as follows:

[COUNSEL FOR WAFFLE HOUSE]: But it needs to be defined.

THE COURT: What, damage?

[COUNSEL FOR WAFFLE HOUSE]: I believe it does under the *Pattern Jury Charge* there's a definition as to damage, what damage means.

THE COURT: Yeah. Damages are defined as a host of things, loss of consortium, loss of earning capacity, loss of household services—that's—they're economic damages.

[COUNSEL FOR WILLIAMS]: Well, I think the damages are defined in Question No. 9, your Honor.

THE COURT: Yeah.

[COUNSEL FOR WILLIAMS]: The damages that she's entitled to. If the jury found that she was damaged by Waffle House's negligent supervision, they would then turn to Question No. 9 and determine the amounts of her damages for those categories listed that are available.

THE COURT: And you're saying the damages are defined as back pay, compensatory—

[COUNSEL FOR WAFFLE HOUSE]: Compensatory damages.

THE COURT: —damages past, compensatory future. How do I know that the jury knows that, to refer to a definition of damages, see—but see, I have a problem doing that because I mean you're telling the jury these are the damages that she suffered. I'm not going to define damages. I'm going to leave it alone. Okay.

Anything else as to that question?

35. *See Olson,* 980 S.W.2d at 893.

36. Tex.R.App. P. 33.1(a); *see also* Tex.R. Evid. 103(a)(1).

37. *Bushell v. Dean,* 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g).

38. *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992) (op. on reh'g).

[COUNSEL FOR WILLIAMS]: Not as to that question, Your Honor.

THE COURT: All right.

The discussion in the conference clearly indicated that the trial court understood Waffle House's objection to be that Waffle House wanted a definition on damages, generally.

Waffle House contends that it preserved error on the trial court's failure to include a definition on damages because it submitted in writing separate damages questions for the sexual harassment and tort claims. But there is a difference between objecting on the ground that jury questions were not asked separately and objecting that instructions were not given.[39] Waffle House needed only to object to the absence of an instruction in such a way that the trial court understood its objection, but it did not do so.[40] Further, when Williams's counsel stated that the jury would answer the compensatory damages question if the jury found that Williams was damaged by Waffle House's negligent supervision, Waffle House did not then notify the trial court of its contention that the jury should not answer the compensatory damages question so as to allow a finding of sexual harassment to be the basis of damages from Waffle House's negligent supervision and retention of Davis. Later in the charge conference, Waffle House specifically objected that the question did not contain a mitigation instruction as in the charge that Waffle House had submitted, but it made no such complaint with respect

to a damages instruction. Neither the objections made nor Waffle House's proposed jury questions informed the trial court of Waffle House's argument that damages needed to be defined in a way that would make the jury understand that it could not base damages for negligent supervision and retention on a finding of sexual harassment by Davis. We therefore hold that the complaint is waived.

Because we hold that the evidence is legally and factually sufficient to support the jury's findings on breach of duty and proximate cause and that Waffle House did not preserve its complaint on the damages instruction, we overrule Waffle House's first issue. We therefore do not address Waffle House's second issue of whether Williams's alternative trial theories can support the judgment.[41]

**Whether Waffle House is Entitled to a New Trial**

We now consider Waffle House's third issue, whether it is entitled to a new trial. Waffle House maintains that it is entitled to a new trial because the trial court abused its discretion by excluding the testimony of Bobbie Griffith, a Waffle House employee, and by excluding an exhibit, specifically a chart summarizing the number of hours Williams and Davis worked together during Williams's employment at Waffle House. Waffle House also maintains it is entitled to a new trial based on the newly discovered evidence from Lisa Stone, Williams's former coworker.

**39.** *See Diamond Offshore Mgmt. Co. v. Guidry,* 171 S.W.3d 840, 844 (Tex.2005) (noting that the Appellant "does not complain that questions about course of employment were not asked separately; it complains that no such questions were asked at all.").

**40.** *See id.* ("While the trial court could certainly have inquired about the separate issues of negligence, causation, and course of em-

ployment in a single question with proper instructions, [Appellant] was not obligated to request such a question. It was required only to object to the absence of any inquiry, *which the trial court acknowledged [Appellant] had done* with its requested questions." Emphasis added).

**41.** *See* Tex.R.App. P. 47.1.

Whether to grant a new trial based on newly discovered evidence is within the discretion of the trial court.[42] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.[43] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.[44] An abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision.[45]

A trial court's rulings in admitting or excluding evidence are also reviewable under an abuse of discretion standard.[46] An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling.[47]

We first decide whether the trial court's exclusion of Griffith's testimony entitles Waffle House to a new trial. Waffle House argues that the trial court abused its discretion by excluding Griffith's testimony, which it contends demonstrates that Williams regularly injected sexual discussions into the work environment. According to Waffle House, the evidence goes to the " 'welcomeness' of sexual chats or conduct in the workplace" and the specific question of whether Davis's conduct was unwelcome to Williams. Williams argues that Waffle House did not preserve this issue for appeal and that Griffith's testimony was properly excluded.

If a proponent offers evidence that the trial court excludes, to preserve error the proponent must present a formal bill of exception to the trial court unless the substance of the excluded evidence was apparent from the context within which the questions were asked.[48] A party cannot rely on a ruling on a motion in limine to preserve error.[49] There is, however, a distinction between a motion in limine and a pretrial ruling on admissibility.[50] A trial court may conduct a pretrial hearing to consider written trial objections to a party's exhibits and "such other matters as may aid in the disposition of the action."[51] At the hearing, the court can issue an order that controls "the subsequent course of the action, unless modified at the trial to

---

42. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983), *overruled in part on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex.2003); *Marvelli v. Alston*, 100 S.W.3d 460, 483 (Tex.App.-Fort Worth 2003, pet. denied).

43. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

44. *Id.*

45. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex.2002).

46. *Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex.2000).

47. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998).

48. Tex.R.App. P. 33.2; Tex.R. Evid. 103(a)(2).

49. *Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 204 (Tex.App.-Texarkana 2000, pet. denied).

50. *Id.* at 204; *see also Owens–Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 557 (Tex.App.-Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex.1998).

51. Tex.R. Civ. P. 166(m), (p); *see also Huckaby*, 20 S.W.3d at 205.

prevent manifest injustice."[52] The rule "does not suggest that it is necessary to go through the same procedure during the course of the trial."[53]

Waffle House had designated portions of Griffith's video deposition that it intended to show at trial. The trial court's scheduling order had required Williams to submit her objections to Waffle House's video designations pretrial, and Williams accordingly filed her objections on April 7, 2005. Williams also filed a motion in limine seeking to keep out the conversations that Williams had with Griffith about Williams's sexual conduct. After Williams submitted her objections, the court requested that a copy of the deposition be attached to her objections. On the first day of trial, the trial court informed the parties of its ruling that the video deposition testimony at question was inadmissible:

> THE COURT: I still have to rule on the videotape deposition, and I've ruled on that, but I've got to change and so ... my coordinator is going to come in and get a copy of the objections and I'll just affix my rulings.
>
> To be truthful, yesterday I ruled that technically—I don't mind saying that—technically Ms. Griffith could talk about all that, but after sitting here reading this case law, there is a distinction, and I caught that. I'm smart enough. I think I caught that distinction where I now—I believe she can't, I've got to scribble through all my markings. Okay? All right.

At the end of that day, the court gave the parties a copy of his ruling on the video deposition designations. In the order, the court granted each of Williams's objections to Griffith's testimony—the same testimony that she sought to keep out through the motion in limine.

Williams contends that because an adverse ruling on a motion in limine preserves nothing for review, Waffle House's failure to offer Griffith's testimony during trial prevents it from arguing error in its exclusion. The trial court did grant Williams's motion in limine. But the trial court also separately ruled on Williams's pretrial objections to the admissibility of the deposition testimony at issue. Prior to trial, Waffle House designated which portions of Griffith's deposition it intended to offer at trial. In accordance with the trial court's scheduling order, Williams submitted written objections to specific portions of the deposition. In a pretrial conference, the court requested and received a copy of the deposition at issue, and Waffle House requested and was granted the opportunity to respond. We do not believe that Waffle House was required to offer the objected-to testimony during the trial by again offering the video deposition. Nor was Waffle House required to offer the testimony by questioning Griffith on the subject while she was on the stand, because Waffle House could not have circumvented the court's ruling by offering in live testimony what could not be offered by the deposition.[54] Additionally, no further offer of proof was necessary because the trial court was given a copy of and looked at the deposition testimony at issue and heard Waffle House's basis for admitting the testimony prior to its ruling, and consequently this evidence was already in the record. The deposition transcript was further made a part of the appellate record by its inclusion as an exhibit in Waffle House's motion for a new trial. Accordingly, we

---

52. Tex.R. Civ. P. 166.

53. *Huckaby,* 20 S.W.3d at 205.

54. *See Huckaby,* 20 S.W.3d at 204.

hold that Waffle House has preserved this complaint.

■ We must therefore consider whether the trial court abused its discretion by excluding the testimony. The comments allegedly made by Williams in this case were never made to Davis, and Davis was not at trial to testify as to whether he overheard any of the comments or what effect they had on his belief as to the welcomeness of his behavior to Williams. The trial court excluded the testimony on the basis that it would only be relevant in a suit against Davis, and because, in this case, admitting the testimony would serve no purpose except to prejudice the jury. After reviewing case law on the issue, the trial court further stated that it believed that under the controlling authority, in this particular case, Griffith could not testify on the matter.

■ Evidence must be relevant to be admissible,[55] and evidence that is relevant may nonetheless be excluded when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[56] Evidence of a plaintiffs "sexually provocative speech or dress" are not per se inadmissible, but a trial court "must carefully weigh the applicable considerations in deciding whether to admit evidence of this kind."[57] The trial court's belief that the testimony had no relevance other than to unfairly prejudice the jury

was not, in this case, arbitrary or unreasonable, considering the lack of evidence as to whether Davis even knew of or heard the comments Williams made to Griffith, that no evidence suggested that Williams made such comments to Davis or established that she made such comments in a manner such that she knew he would hear her, and no evidence suggested that any of the other Waffle House employees testifying at trial knew anything about or had ever heard these conversations.[58] We therefore hold that the trial court did not abuse its discretion in excluding the testimony.

■ We next determine whether the trial court abused its discretion by excluding Waffle House's graph summarizing the amount of time that Williams and Davis worked together. The trial court sustained Williams's objection to the graph's admittance because Waffle House's sponsoring witness did not create the graph herself, did not know who did, and was not sure whether it was created before or after trial began.

■ The Texas Rules of Evidence generally require evidence to be authenticated or identified as a condition precedent to its admissibility.[59] A trial court does not abuse its discretion by excluding evidence that has not been authenticated.[60] Because Waffle House's sponsoring witness could not authenticate the graph and the

55. Tex.R. Evid. 402.

56. Tex.R. Evid 403.

57. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 69, 106 S.Ct. 2399, 2406–07, 91 L.Ed.2d 49 (1986).

58. *See Howard v. Historic Tours of Am.*, 177 F.R.D. 48, 51 (D.D.C.1997) (applying *Meritor* but stating that "that the plaintiffs may have engaged in sexual behavior with their co-workers other than the harassing employees might be construed as welcoming the harass-ing conduct complained of only if the harassing employees knew of it").

59. Tex.R. Evid. 901(a).

60. *ESIS, Inc., Servicing Contractor v. Johnson*, 908 S.W.2d 554, 561 (Tex.App.-Fort Worth 1995, writ denied) (holding that the trial court abused its discretion in admitting an unauthenticated copy of a commission appeals panel opinion).

graph was not otherwise authenticated, we hold that the trial court did not abuse its discretion in excluding the graph.[61]

We next consider whether Waffle House is entitled to a new trial based on the newly discovered evidence from Lisa Stone. A party seeking a new trial on the ground of newly discovered evidence must show the following: (1) the evidence has come to light after trial; (2) it was not owing to want of due diligence that the evidence did not come to light sooner; (3) the new evidence is not cumulative; and (4) the evidence is so material that it would likely produce a different result if a new trial were granted.[62] The newly discovered evidence should "bring to light a new and independent truth" that is "so decisive as to show that justice has not been obtained."[63]

Stone is a former Waffle House employee. During her employment at Waffle House, she worked with Williams. In Waffle House's attorney's affidavit in support of the motion for a new trial, he states that in the records of and interviews with people identified as persons with knowledge of relevant facts, Stone's name was never mentioned as a person who would have knowledge of relevant facts. He states that her name does not show up in time records for unit 206 until week 43 of 2001. He also states that Waffle House was unaware of Stone's new address in Mineola, Texas, where she moved after her employment with Waffle House ended.

In Stone's affidavit in support of the motion for a new trial, she stated that she never saw Davis have inappropriate conversations or contact with Williams or any other employee, that Williams was habitually late to work, and that Williams had regular conversations with her about Williams's sexual conduct. She also states that she contacted Waffle House after reading about the jury verdict in a newspaper.

Waffle House claims that Stone's evidence is not cumulative. But Stone's affidavit simply recites more instances of Williams's allegedly discussing her sexual conduct with a coworker. Like Griffith's deposition testimony, nowhere in Stone's affidavit does she say that Williams discussed anything of a sexual nature with Davis or in any way indicated to Davis that his comments to her or his touching her were welcome. In its reconsideration of the motion for a new trial, the trial court stated, "I believe that to allow that Bobbie Griffith information in was nothing but an attempt to prejudice the jury and I still believe that." Thus, if Waffle House had been aware of Stone's evidence prior to trial, the trial court most likely would have excluded it, just as it excluded Griffith's testimony. Because the trial court did not abuse its discretion in excluding Griffith's testimony, it likewise would not have been an abuse of discretion for the trial court to exclude Stone's testimony on the same grounds.

Although Stone's affidavit corroborates Griffith's deposition testimony that Williams discussed her sexual conduct with others, we cannot say that Stone's testimony is so material that it would probably cause a different result or that it brings to light a new and independent truth because

**61.** *See* Tex.R. Evid. 901; *see also ESIS, Inc.,* 908 S.W.2d at 561.

**62.** *Marvelli,* 100 S.W.3d at 483.

**63.** *In re Marriage of Yarbrough,* 719 S.W.2d 412, 415 (Tex.App.-Amarillo 1986, no writ); *see also New Amsterdam Cas. Co. v. Jordan,* 359 S.W.2d 864, 867–68 (Tex.1962) (holding that trial court did not abuse its discretion by denying a new trial when new evidence did not "bring to light a new and independent truth").

it does not shed light on whether Davis knew of these discussions or whether the discussions affected his behavior toward Williams or her reaction to his behavior. Accordingly, we hold that the trial court did not abuse its discretion in not granting a new trial based on Stone's testimony.

Because the trial court did not abuse its discretion by excluding portions of Griffith's deposition testimony or Waffle House's graph summary or by not granting a new trial based on Stone's evidence, we overrule Waffle House's third issue.

## Whether Waffle House is Entitled to Reversal of the Punitive Damages Award

■ In its final issue, Waffle House argues that the award of punitive damages must be reversed because there is no legally or factually sufficient evidence to support the jury's findings that Waffle House acted maliciously or with reckless indifference toward Williams. Punitive damages awards must be supported by clear and convincing evidence.[64] Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.[65] This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings.[66] While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.[67]

This higher burden of proof elevates the appellate standard of legal sufficiency review.[68] In reviewing the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true.[69] We must review all the evidence in the light most favorable to the finding.[70] This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.[71] We must also disregard all evidence that a reasonable factfinder could have disbelieved.[72] We must consider, however, undisputed evidence even if it is contrary to the finding.[73] That is, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.[74]

■ This higher burden of proof also elevates the appellate standard of factual

64. Tex. Civ. Prac. & Rem.Code Ann § 41.003 (Vernon Supp.2006).

65. Id. § 41.001(2); Tex. Fam.Code Ann. § 101.007 (Vernon 2002); Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex.1994).

66. In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588 S.W.2d 569, 570 (Tex.1979).

67. Addington, 588 S.W.2d at 570.

68. Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170 (Tex.2005); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 622, 625 (Tex. 2004).

69. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627.

70. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627.

71. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627.

72. Hall, 168 S.W.3d at 170; Garza, 164 S.W.3d at 627.

73. Wilson, 168 S.W.3d at 817; Hall, 168 S.W.3d at 170.

74. Wilson, 168 S.W.3d at 827.

sufficiency review.[75] On appeal, we cannot view a finding that must be based on clear and convincing evidence the same as one that may be sustained on a mere preponderance.[76] In considering whether the evidence rises to the level of being clear and convincing, we must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that its finding was true.[77] We must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding.[78] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[79] Whether reversing or affirming an award of punitive damages, our opinion must state the reasons for reversing or upholding the jury's finding and must detail the evidence or lack of evidence relating to the liability for punitive damages, in light of the requirements of chapter 41 of the Texas Civil Practice and Remedies Code.[80]

Under the statute in effect at the time Williams filed her lawsuit, to be awarded punitive damages, a claimant had to prove by clear and convincing evidence that the harm suffered by the claimant resulted from malice.[81] Malice as defined by the applicable statute and under the jury charge submitted is either (1) a specific intent to cause substantial injury to the claimant, or (2) an act or omission that "when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others," and "of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others." [82] The second definition incorporates the elements of the Texas Supreme Court's gross negligence standard.[83]

■ A corporation can only act through an agent or agents.[84] Consequently, Waffle House is liable for punitive damages only if (1) an agent of Waffle House acted with malice and Waffle House ratified the act, (2) Waffle House maliciously hired an unfit agent, or (3) Waffle House acted with malice through a vice principal.[85]

Waffle House does not dispute that the unit managers and district managers are vice principals. But Waffle House argues that, given that the jury failed to find ratification of Davis's conduct or retaliation by Waffle House, there is no legally or factually sufficient evidence that Waffle

75. *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002).

76. *Id.*

77. *Id.* at 28.

78. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002).

79. *Id.*

80. Tex. Civ. Prac. & Rem.Code Ann. § 41.013(a) (Vernon 1997).

81. Act of Apr. 12, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 110 (amended

2003) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a)).

82. *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7) (Vernon 1997).

83. *Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 373 (Tex.2004); *see also Moriel,* 879 S.W.2d at 23.

84. *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex.1998).

85. *See Qwest Int'l Commc'ns, Inc. v. AT & T Corp.,* 167 S.W.3d 324, 326 (Tex.2005).

House's vice principals acted with the specific intent to cause harm to Williams or with an awareness of an extreme degree of risk. We agree that there is no evidence that vice principals acted with specific intent to harm Williams, but we disagree that there is no evidence that such vice principals acted—or failed to act—with an awareness of an extreme degree of risk. We conclude that the jury could have reasonably found by clear and convincing evidence that the Waffle House managers had actual, subjective awareness of the risk involved and that their conduct amounted to conscious indifference toward Williams's rights, safety, or welfare.

Given the complaints made to them, the evidence shows that the managers had actual awareness of the risk posed by Davis's conduct.[86] Waffle House trained its managers on its sexual harassment policy and on the type of conduct that constitutes sexual harassment. The Waffle House managers were therefore aware of Waffle House's policy regarding sexual harassment and of their duty to administer and follow the policy, which they breached.[87] Given their training, and given that Williams made several complaints on multiple occasions of repeated violations of company policy, the managers "necessarily had to have actual, subjective awareness of the risk involved in conduct prohibited by such policy and the attendant necessity to conduct an investigation commensurate with the seriousness of" the allegations of sexual harassment.[88]

The Waffle House managers, however, failed to follow company policy, failed to conduct their own investigations, failed to determine if any investigation was made, and failed to ensure that Williams did not come into contact with Davis during her working hours, as detailed above. Given the managers' conduct and the seriousness of Williams's allegations to them, we believe that the evidence is legally and factually sufficient to support the jury's award of punitive damages. That is, the evidence presented is such that the jury could have reasonably formed a firm belief or conviction that the failure to act by Waffle House managers created an extreme degree of risk to Williams and showed a conscious indifference to Williams's rights, safety, or welfare.[89] Accordingly, we overrule Waffle House's final issue.

### CONCLUSION

Having disposed of all of Waffle House's issues, we affirm the trial court's judgment.

86. *See Itz,* 21 S.W.3d at 478.

87. *See id.* at 478.

88. *Id.*

89. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7).