02-05-373-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-05-00373-CV

 

 


 
 
 Waffle House, Inc.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Cathie Williams
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

FROM THE 67th
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1] ON
REMAND

----------

This
case is on remand from the Supreme Court of Texas, which reversed this court’s
previous affirmance of the trial court’s judgment in favor of Appellee Cathie Williams.[2] 
Williams had sued Appellant Waffle House, Inc. on a claim for negligent
retention and supervision based on the behavior of a coworker.  She also
asserted a statutory sexual harassment claim under the Texas Commission on
Human Rights Act (TCHRA)[3] (chapter 21 of the labor
code) based on the same behavior.  We previously affirmed the trial court’s
judgment on Williams’s negligence claim and therefore did not reach Waffle
House’s arguments regarding Williams’s statutory sexual harassment claim. 
After reversing on the ground that the TCHRA is the exclusive remedy for sexual
harassment under Texas law, the Supreme Court directed this court to consider
Waffle House’s arguments on Williams’s statutory claim.[4]

In
two issues, Waffle House argues that Williams waived her right to recover on
her TCHRA claims by failing to file a notice of appeal to challenge the trial
court’s denial or omission of that relief in the final judgment and,
alternatively, that the evidence is legally and factually insufficient to
support the jury’s findings on sexual harassment, constructive discharge, and
punitive damages.  Because we hold that Williams did not waive her right to
recover under the TCHRA, that the evidence was sufficient to support the jury’s
findings, and that the damage award has to be capped under the labor code, we affirm
the trial court’s judgment in part as modified.  Because the trial court made
no findings on attorney’s fees or expert costs and because pre- and
post-judgment interest must be recalculated, we reverse and remand in part.

I. 
Background Facts and Procedural History

In July
2001, Waffle House hired Williams as a waitress.  During Williams’s employment
with Waffle House, she had a number of different managers.  At the time of her
hiring, Ossie Ajene was the store manager, and T.J. Marshall was the district
manager.  In December 2001, Kevin Love replaced Ajene as the store manager.  Allen
Conley replaced Marshall as the district manager in January 2002.  Kevin Ross
was the division manager (the manager over the district managers) at that
time.  Managers did not usually work the third shift, the shift that Williams
worked.

Within
Williams’s first week of work, she became the recipient of unwelcome sexual behavior
and comments from fellow employee Eddie Davis, a cook.  Williams reported Davis
to Ajene, Marshall, Love, and Conley.  She also called a Waffle House corporate
telephone line to report the problem.  Davis was moved to a different shift,
but his unwelcome behavior continued.

In
February 2002, Williams quit her job at Waffle House.  After receiving right to
sue notices from the EEOC and the Texas Commission on Human Rights, Williams
filed suit against both Davis and Waffle House.  She asserted a claim for
assault and battery against Davis.  Against Waffle House, she alleged negligent
supervision and retention, as well as ratification of Davis’s assault and
battery.  She also alleged sexual harassment and retaliation under the TCHRA.[5] 
Davis, who could not be found at the time of trial, was nonsuited by Williams
before trial.

In a
10-2 verdict, the jury found that Davis had sexually harassed Williams and that
Waffle House’s negligence in supervising Davis proximately caused Williams’s
damages.  The jury also found that Waffle House constructively discharged
Williams by an official action.  The jury did not find that Waffle House
ratified Davis’s assault.  The jury also found that Waffle House did not
retaliate against Williams for making her sexual harassment complaint.  The
jury found $400,000 in past compensatory damages, $25,000 in future
compensatory damages, and $3,460,000 in punitive damages.  The trial court rendered
judgment awarding the past and future compensatory damages, $53,201.09 in
prejudgment interest, and $4,728.60 for court costs. The court lowered the
punitive damages award to $425,000 due to the general cap on punitive damages. 
Waffle House filed a motion for new trial and, alternatively, a suggestion of
remittur of damages, and a motion for judgment notwithstanding the verdict.  The
trial court denied the motions, and Waffle House appealed.

On Williams’s
negligent supervision or retention claim, Waffle House challenged the
sufficiency of the evidence on breach of duty and causation.[6]
 This court held that the evidence was sufficient on both elements and that
“[t]he evidence presented at trial showed that Waffle House did not conduct a
sufficient investigation given the gravity of Williams’s complaints, did not
follow its own procedures for investigating such complaints, [and] did not take
reasonable precautions to prevent interaction between Williams and Davis.”[7] 
Because this court affirmed on Williams’s common law claim, it did not reach
Waffle House’s arguments with respect to her statutory harassment claim.[8]

On
review, the Supreme Court of Texas reversed this court and held that Williams’s
common law claim failed because her exclusive remedy against Waffle House was
her statutory harassment claim under chapter 21.[9]  That court remanded the
case back to this court to consider the statutory sexual harassment issues
raised by Waffle House and not previously addressed by this court.[10]

II. 
Waiver

Waffle
House argues in its first issue that because the trial court’s judgment denied
or omitted recovery on Williams’s TCHRA claim, she abandoned the claim by
failing to file a notice of appeal challenging the judgment on the ground that
it omitted her requested alternative relief.  We disagree.

Williams
submitted to the trial court two proposed judgments.  Each judgment awarded
recovery on the negligence findings, but one capped the punitive damages and the
other did not.  Both of the proposed judgments included alternative relief
recognizing the jury’s favorable findings on Williams’s TCHRA claim and the
award of attorney’s fees and expert fees.  Williams acknowledged that the
expert costs and attorney’s fees were only recoverable under the TCHRA claim
and not under the negligence theory,[11] and she explained to the
trial court that she had requested the alternative relief in the event that the
negligence claim was reversed on appeal.

Waffle
House objected to Williams’s proposed judgments on the ground that the judgment
“should reflect one award, either the sexual harassment claim or the negligent
supervision claim,” and that Williams “should be forced to elect the greater of
the two,” or, if she would not, then the trial court should award the greater
of the two recoveries.  As requested by Waffle House, the trial court signed a
judgment that did not award the requested alternative relief.  The judgment
stated that the jury had made findings that the court “has received, fully
adopted[,] and entered into the [c]ourt’s record.”  The judgment then stated
that “each and every one of the jury’s responses” to the charge was incorporated
by reference.  The judgment ordered that Williams not recover attorney’s fees
and expert costs; as Williams pointed out to the court, these costs were not
recoverable under her negligence cause of action.[12]
 Williams did not file a notice of appeal, but in her appellee’s brief, she did
argue that should her negligence claims be reversed, she was entitled to recover
on her sexual harassment claim.

Williams
was not required to do more than she did to preserve her right to alternative
relief.  In Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.,
Boyce sued Southwestern Bell on alternative theories of negligence and
violations of the Deceptive Trade and Practices—Consumer Protection Act (DTPA).[13]  Boyce obtained
favorable jury findings on both theories of recovery.[14] 
The trial court rendered a judgment granting the more favorable relief under
the DTPA.  The judgment incorporated the jury’s verdict “for all purposes.”[15] 
Southwestern Bell appealed, and, in a crosspoint, Boyce asked the court of
appeals to render judgment on its negligence theory if it reversed on its DTPA
claim.[16]  The Supreme Court of
Texas considered whether Boyce was required to have raised a complaint in the
trial court before raising a crosspoint on appeal asking for an award on its
negligence claim.[17]  The Supreme Court held
that when a jury returns favorable findings on alternative theories, the
prevailing party “may seek recovery under an alternative theory if the judgment
is reversed on appeal.”[18]  The court noted that
the general rule that a party must bring error to the trial court’s attention
before complaining by crosspoint on appeal “does not apply in this case because
Boyce received a favorable judgment and had no reason to complain in the trial
court.”[19]  The court stated that “Boyce
was not required . . . to raise the issue of alternative grounds for recovery
until the court of appeals rendered its judgment reversing the DTPA judgment”
and that “Boyce had no duty to complain in the trial court when it recovered
all relief available under its DTPA claim.”[20]  Finally, the court said
that “[b]y incorporating the jury’s findings in the court’s judgment, Boyce did
everything it could to preserve the right of recovery under the alternative
theory.”[21]

In 2006,
the Supreme Court held that when a party has been awarded the more favorable
recovery under two theories, the party is “not required to raise the
alternative theory as a cross point on appeal.”[22]  Two years later, the Supreme
Court discussed Boyce, characterizing it as holding that “a litigant who
has obtained a favorable judgment and has no reason to complain in the trial
court is not required to raise an issue regarding an alternate ground of
recovery until an appellate court reverses the judgment.”[23]
 Thus, the plaintiff in that case “was not required to raise his alternate
theory of recovery until the judgment in his favor about which he had no
complaint was reversed.”[24]

Waffle
House argues that Boyce does not help Williams because the rule from
that case applies if an appellee receives a favorable judgment and is satisfied
with it, and “to be satisfied” with the judgment “is not to be satisfied with
what one believes could have been awarded in the judgment.”  That is, Williams
is not entitled to have a court “go back and fashion a new judgment that she
believes she could have been awarded (but was explicitly denied instead).” 
Waffle House also argues that whereas in Boyce, the trial court had
incorporated the jury findings “for all purposes,” here the trial court “merely
stated that it ‘fully adopted’” the jury’s findings “and incorporated [them] by
reference.”

Waffle
House’s attempts to distinguish the case law are unpersuasive.  The trial court
here clearly adopted and incorporated all of the jury’s findings, and it was
not necessary for the court to use the words “for all purposes.”  The trial
court then awarded Williams the highest relief that she could have recovered
under the verdict.  Williams had no duty to complain in the trial court or on
appeal here when she recovered all the relief that was available to her on her
negligence claim and when she could not recover under both her negligence and
statutory claims.[25]  She had nothing to
complain about at that point and was not required to raise the alternative
theory on appeal until a court had reversed that judgment about which she had
no complaint.[26]  On remand to this
court, Williams has argued that she should be awarded recovery on her
alternative theory, and she has not waived the issue by failing to have filed a
notice of appeal or a cross-appeal when the case was previously before this
court.[27]

Waffle
House also argues that this court has held that an appellee must file a notice
of appeal and crosspoints in order to have the right to seek a modified
judgment on alternative claims, citing Commonwealth Lloyds Ins. Co. v. Downs.[28] 
Waffle House is incorrect; nowhere in Downs did this court state that
without filing a notice of appeal or asserting a crosspoint, an appellee may
not request a judgment on alternative claims.[29]  This court stated that
although Downs had filed cross-points, they were “not phrased so as to request
that this court affirm the judgment on the alternative causes of action if the
judgment cannot be affirmed on the causes of action” on which the judgment had
been based.[30]  We nevertheless
considered Downs’s challenge to the trial court’s action in denying judgment on
the alternative causes of action.  And we did not state that an appellee must
filed a notice of appeal to be entitled to alternative relief upon reversal of
a favorable judgment; the appellee in that case had filed a notice of appeal
for the crosspoints he had raised, so the issue did not arise.  We overrule
Waffle House’s first issue.

III. 
Sufficiency of the Evidence

In
its second issue, Waffle House argues that the evidence is legally and
factually insufficient to support the jury’s findings that Williams was sexually
harassed, that she was constructively discharged, and that Waffle House acted
with malice or reckless indifference to Williams’s right to be free from sex
discrimination.  Waffle House also argues that the evidence did not permit the
jury to conclude that Waffle House failed to take prompt remedial action.

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.[31]  In determining whether
there is legally sufficient evidence to support the finding under review, we
must consider evidence favorable to the finding if a reasonable factfinder
could and disregard evidence contrary to the finding unless a reasonable
factfinder could not.[32]

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming weight
of all the evidence, that the answer should be set aside and a new trial
ordered.[33]

A.  Jury’s
Findings on Sexual Harassment

Under
the TCHRA, an employer commits an unlawful employment practice if, (1) because
of sex, (2) the employer, among other things, discharges or discriminates
against an individual (3) in connection with compensation or the terms,
conditions, or privileges of employment.[34]  An employer also commits
an unlawful employment practice if, (1) because of sex, (2) the employer
“limits, segregates, or classifies an employee or applicant for employment in a
manner that would [a] deprive or tend to deprive an individual of any
employment opportunity or [b] adversely affect in any other manner the status
of an employee.”[35]  Sexual harassment is a
form of sex-based discrimination prohibited under the labor code.[36]

Courts
have distinguished between two types of sexual harassment claims:  “quid pro
quo” claims and “hostile work environment” claims.  A “quid pro quo” sexual
harassment claim is one in which a supervisor made threats affecting the terms
or conditions of a subordinate’s employment by conditioning them on the
employee’s grant of sexual favors and, when the employee refused, the
supervisor carried out his or her threat.[37]  A “hostile work
environment” claim is one in which either no threats to the terms or conditions
of employment are made or the threats are not carried out, but the employer’s
sexually demeaning behavior nevertheless altered terms or conditions of
employment.[38]  Distinguishing between
these two types of claims serves a specific and limited purpose:  to determine
the threshold question of whether the conduct in question constituted
discrimination in violation of Title VII.[39]  In “quid pro quo
harassment,” because employment benefits are conditioned on sexual favors and
the employee is retaliated against for denying those favors, the “discrimination
with respect to terms or conditions of employment [is] explicit.”[40]

In “hostile
work environment harassment,” when threats to retaliate against an employee for
denying sexual liberties are either not made or are not carried out and the
claim is based on “bothersome attentions or sexual remarks,” the plaintiff must
show that the harassment is sufficiently severe or pervasive to create a
hostile work environment.[41]  Thus, the use of the these
terms is helpful to distinguish between claims in which alterations of the
terms or conditions of employment were explicit and those in which the alterations
were constructive, in which case the plaintiff must show severe or pervasive
conduct.[42]  But whether an employer
is vicariously liable for an employee’s discrimination does not depend on which
kind of claim is asserted by the plaintiff.[43]  As discussed below, an
employer may be liable for a hostile work environment claim under agency
principles and the avoidable consequences doctrine of tort law.[44] 
This is the form of sexual harassment alleged by Williams.

Hostile
work environment sexual harassment is recognized as a violation of Title VII
because “a requirement that a man or woman run a gauntlet of sexual abuse in
return for the privilege of being allowed to work and make a living” is an
arbitrary barrier to sexual equality at the workplace.[45]
 A “discriminatorily abusive work environment” can “detract from employees’ job
performance, discourage employees from remaining on the job, or keep them from
advancing in their careers,” and “the very fact that the discriminatory conduct
was so severe or pervasive that it created a work environment abusive to
employees” because of their gender offends the “broad rule of workplace
equality” of Title VII of the federal Civil Rights Act of 1964, and,
consequently, of the TCHRA.[46]

To
some claims of hostile work environment sexual harassment, an employer may
assert an affirmative defense (as discussed below), but for other claims, the
employer is strictly liable.[47]  For purposes of
determining whether the employer is strictly liable, hostile work environment
sexual harassment claims can be further divided into two categories:  (1) claims
alleging harassment culminating in a tangible employment action and (2) claims
asserting no tangible employment action.[48]  A tangible employment
action “constitutes a significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in benefits.”[49] 
The employer in such a case is strictly liable for an employee’s harassment by a
supervisor under the common law “aided in the agency relation rule” of agency
law because “[a] tangible employment decision requires an official act of the
enterprise, a company act” and “[w]hen a supervisor makes a tangible employment
decision, there is assurance the injury could not have been inflicted  absent
the agency relation.”[50]

But
for a claim in which the employee does not allege a tangible employment action,
borrowing from the avoidable consequences doctrine, the United States Supreme
Court has said that the employer may assert an affirmative defense to liability
based on the employer’s efforts at preventing and correcting harassment.[51]
 To establish this defense, the employer must show (1) “that the employer
exercised reasonable care to prevent and correct promptly any sexually
harassing behavior” and (2) “that the plaintiff employee unreasonably failed to
take advantage of any preventive or corrective opportunities provided by the
employer” or to otherwise avoid harm.[52]

In
some cases an employer has not fired an employee or taken some other tangible
employment action, but the employer has nevertheless made the “working
conditions so intolerable that a reasonable person would [feel] compelled to
resign.”[53]  Such behavior by the
employer is referred to as “constructive discharge.”[54]

In Suders,
the United States Supreme Court discussed one subset of constructive discharge
claims:  constructive discharge resulting from a hostile work environment
attributable to a supervisor.[55]  The Court distinguished
between constructive discharge claims involving a tangible employment action
and those that do not, recognizing that the conduct leading to the employee’s
decision to resign may or may not have involved official action by the employer.[56] 
The Court noted that with respect to the damages-enhancing provision of Title
VII, constructive discharge is “functionally the same as an actual termination,”
and for remedial purposes is likened to formal discharge.[57] 
But, the Court stated, unlike employers in cases of formal termination, an
employer is not always strictly liable for this type of sexual harassment
claim.[58]  Under federal law at
least, whether an employer may assert an affirmative defense to a claim of
constructive discharge depends on whether a supervisor’s official act precipitates
the constructive discharge; “when an official act does not underlie the
constructive discharge,” the employer may assert the affirmative defense.[59]

Waffle
House argues that the evidence is not sufficient to support a finding of either
constructive discharge or hostile work environment.  We first consider the
sufficiency of the evidence on Williams’s hostile work environment claim.

(1)
Hostile Work Environment

As
noted above, to establish a claim for hostile work environment sexual harassment,
the complained-of conduct must be severe or pervasive enough “‘to alter
the conditions of [the complainant’s] employment and create an abusive working
environment.’”[60]  Thus, the “mere
utterance of an . . . epithet which engenders offensive feelings in an
employee” will not constitute sexual harassment for which an employer may be
held liable.[61]  An employer may be
found liable for the conduct of a supervisor based on that supervisor’s failure
“to act to abate sexual harassment by others after learning of it.”[62]

To
determine whether a hostile work environment exists, courts must look to all of
the circumstances.[63]  These circumstances “may
include the frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee’s work performance.”[64]
 The environment must be both subjectively and objectively offensive:  it must
be an environment that the plaintiff perceived to be offensive and one that a reasonable
person in the plaintiff’s position would consider to be offensive.[65]

Not
only did Williams testify that she found the behavior offensive, but she
reported Davis’s behavior to four managers whom she worked under during the
time she worked with Davis at Waffle House, and she told both fellow waitress
Bobbie Griffith and Love that she was considering quitting her job because of
the lack of any response from Waffle House.  Griffith testified that Williams
was frustrated and cried “a lot” because of Davis’s behavior and the lack of
response by Waffle House.  The evidence is clearly both legally and factually
sufficient that Williams perceived the work environment to be offensive.

We
therefore consider whether the evidence was sufficient to meet the objective
part of this standard, that is, whether a reasonable person in Williams’s
position would have found the environment to be offensive.[66] 
Davis made his first unwelcome sexual comment to Williams sometime within her
first week on the job with him in July 2001.  As Williams walked up to Davis
and Pat (a waiter and the only employee on the premises other than Davis and
Williams), Davis looked her up and down, said “Uhmm,” and told the other waiter
that Williams “looked like [his] baby’s mama.”  He had also said that Williams
“ha[s] a fine ass for a white woman.”  Williams testified that Davis’s comments
made her feel “dirty” because “he’s referring to [her] as someone he had sex
with.”  Williams stated that she had had no training on what to do in this type
of situation.  But, she testified, she reported the incident to her manager,
Ajene, the first time she saw him, which was within a couple of days of the
occurrence.

On
another occasion, while Williams was washing dishes, Pat took a spoon “and put
it in [her] back and asked [her] if [she’d] ever been spooned or if [she]
wanted to be.”  He then “took out a whisk and kind of whisked it in [her] back
and said, ‘Have you ever been whisked’?”  At the time, Davis was also there. 
Both men “were acting like it was funny,” which Williams testified made her
feel as though she “didn't have a choice,” as though she were expected to go
along with their joking.  Williams sprayed Pat with the hose at the sink and
told him to stop, and she testified that he did so.  Pat stopped his behavior,
but Davis did not.

Ajene
testified that he first heard about the problem from Griffith, to whom Williams
had complained about the matter.  But Williams testified that she personally
told Ajene, and the jury was free to believe her.[67]
 In her testimony, Williams stated that when she told Ajene, he “laughed and
said that doesn’t sound like [Davis].”  When she insisted, Ajene responded,
“Fine.  I'll talk to him.”  But nothing changed, and Williams testified that
Davis “kept on.”

Williams
told the jury that Davis would corner her and push her into things—“into the
counters[,] and into the grill, into the dish table.  Every time I'd walk by,
he’d back up and push me into things.”  Davis, who was black, asked Williams
“if [she] ever had the flavor of a black man or if [she] ever wanted to.”  While
he was saying this to her, Davis had “his hands down his pants,” which Williams
said he did often.

After
Williams complained to Ajene about Davis, Ajene held a meeting with Williams,
Davis, and Griffith about Davis’s temper, at which Davis, who was much larger
than Williams, “put his finger in [Williams’s] face” and told her that she “was
too tense and [she] need[ed] to quit being so sensitive.”  Ajene talked to
Davis about Williams’s complaints, but Williams testified that this talk did
not solve the problem, and instead Davis became even more hostile.  Whenever
Williams came anywhere near him, “he’d be real huffy and push [her] around.”  If
she came near him, “he made a point to push [her] out of his way and told [her]
to get the F off his grill.”  Williams testified that she reported Davis’s
behavior to Ajene several times.

Davis
was moved to a different shift, which Williams testified made Davis even more
hostile.  Davis cornered her several times.  Once when Williams was waiting on
a table, Davis came up behind her and pushed himself up against her and held
her arms.  Williams stated that she “felt his whole front side on [her]
backside,” that is, he pressed his whole body—including his “pelvic region”—up
against her.  She could feel him breathing on her neck, and he shook her and
said to the customers, “Isn’t she great?  Isn’t she wonderful?”  Davis held
himself so tight against her that she was pushed into the counter she was
standing behind, and trapped her there until he left.[68] 
On several occasions, he trapped her against the counter or against the grill.

When
Williams would put plates away above the grill, Davis would move his arm across
to rub against her breasts.  Once when Williams went to the refrigerator, when
she turned around, Davis was blocking her path with his arm up on the freezer
door.  She asked him to move, but he did not.  She finally had to duck under
his arm to get around him.  Another time, after Davis had been moved to the
second shift, when Williams went to the time clock to clock out, Davis was
sitting by the clock playing scratch-off lottery tickets.  On Ajene’s advice to
try to get along with Davis, Williams asked him if he had won anything.  Davis
chuckled and opened his hand to show her a condom.  On other occasions when
Davis was off duty, he would nevertheless be in the restaurant, and Williams
would notice him staring at her.  Sometimes he winked at her.

Williams
testified that Davis was at the restaurant frequently when off the clock.  His
roommate also worked at the restaurant, on the same shift as Williams.  Davis
and his roommate shared a car, so Davis often drove his roommate to work, and
Davis would spend time at the restaurant while his roommate worked.

Ajene
told Williams that he would not move Davis to another restaurant or terminate
his employment unless Williams found a replacement cook.  Williams testified
that once, Ajene showed her a picture of a man from a strip club, laughed, and
said, “Look what I found here, Cathie.  It’s your boyfriend.”  This happened
after she had reported Davis’s conduct to Ajene.

In
its defense, Waffle House produced testimony from Griffith, who worked with
Williams much of the time, that she never witnessed any sexual harassment by
Davis.  But Griffith also agreed that it was “very possible” that things were
happening between Davis and Williams that she did not see and that she
preferred to stay out of matters that did not involve her.  She also testified
that Williams would talk to her about having ongoing problems with Davis and
that Williams had told her she was thinking about quitting because of Davis.  Ajene,
Love, Marshall, and Conley also testified that they never saw Davis harass Williams,
but the evidence showed that a manager was not normally present during
Williams’s shift.  We hold that the evidence produced by Williams at trial was
some evidence, and thus legally sufficient evidence, that a reasonable person
in Williams’s position would have found the work environment at Waffle House to
be offensive.

Waffle
House argues, however, that the evidence was insufficient because Williams made
this a “she said/she said” case.  It points out that Williams nonsuited Davis,
“and therefore no one heard his side of the story.”  Williams’s nonsuiting of
Davis was not what prevented the jury from hearing Davis’s version of events
because of course a person may be subpoenaed to testify even if the person is
not a party to the lawsuit.[69]  As Waffle House is
aware, Davis did not appear for his deposition, and Williams could not find him
at the time of trial.  Waffle House does not explain why it did not locate
Davis to have him testify or take his deposition before trial if it believed
that Davis’s testimony would have been helpful.

Waffle
House next points out that Williams had named four potential eyewitnesses, but
that only one of these people, Griffith, testified at trial, and then Williams
“strenuously fought to keep out crucial parts of Griffith’s testimony that
indicated that Williams herself participated in sexual banter or suggestive
behavior.”  There is no evidence in the record—absolutely none—that Williams
ever engaged in this kind of “banter” with Davis.  Giving Waffle House the
benefit of the doubt, we assume that it is not taking the position that a woman
who engages in conversation of a sexual nature with one person could never be
sexually harassed, under the theory that such a woman could not possibly find
it offensive when unsolicited sexual comments or acts are directed at her by
anyone.  But then we are at a loss as to why Waffle House keeps pointing out
this testimony, much less referring to it as “crucial,” considering that both
this court and the Supreme Court of Texas have said that the trial court
properly excluded it.[70]  This testimony may have
been “crucial” to a strategy to prejudice the jury against Williams, but not to
establish that she did not find Davis’s conduct offensive or that the conduct
did not create a hostile work environment.  We are baffled as to why we need to
point this out to Waffle House for a third time.

The
jury, as the sole judge of credibility, was entitled to believe Williams’s
testimony.  The fact that the jury did not hear Davis’s side of the story does
not make the evidence legally or factually insufficient.  To the extent that
Waffle House alleges that facts may never be established by the testimony of
one witness, it is mistaken.[71]  We conclude that the
credible evidence supporting the jury’s finding is not so weak or so contrary
to the overwhelming weight of all the evidence that the answer should be set
aside.  Accordingly, we hold that the evidence is factually sufficient to
support the jury’s finding.  We overrule the part of Waffle House’s second
issue relating to the sufficiency of the evidence of a hostile work
environment.

(2) Affirmative
Defense to Hostile Work Environment:  Prompt, Remedial Action

When
a plaintiff has established a prima facie hostile work environment claim, as
Williams did in this case, the defendant employer may avoid liability by
establishing an affirmative defense.[72]  To prove the
affirmative defense, the employer must show that (1) it exercised reasonable
care to prevent and promptly correct the harassing behavior, and (2) the
plaintiff unreasonably failed to take advantage of any preventive or corrective
opportunities provided by the employer or to otherwise avoid harm.[73]  Question four of
the jury charge tracked these elements and asked whether, based on these
elements, Waffle House was legally excused from responsibility for Davis’s
conduct.  The jury answered “no.”  On appeal, Waffle House argues that it took
prompt, remedial action that was reasonably calculated to end the harassment
and that Williams declined to use procedures that could have aided in enabling
Waffle House to take quick and decisive action.

Waffle
House challenges both the legal and factual sufficiency of the jury’s finding
against it.  As the party relying on the affirmative defense, Waffle House had
the burden of proof to establish both elements of its defense.[74] 
Because Waffle House complains of the jury’s failure to make a finding in its
favor on a question for which it had the burden of proof, on appeal Waffle
House must show that it established the affirmative defense as a matter of law
or that the jury’s failure to find is against the great weight and
preponderance of the credible evidence.[75]

In
its brief, Waffle House points out evidence that it contends supported its
affirmative defense.  It notes that after hearing about Williams’s complaint,
Ajene “promptly confronted Davis” and then moved Davis to a different shift,
even though Davis denied the conduct.  After the shift change, Williams and
Davis only had to work together for a total of about eighteen hours, due to
overlap  during the shift change.  Other managers asked Griffith “to look out
for interaction between Davis and Williams,” and Marshall assisted Williams in
calling the Waffle House associate hotline for reporting harassment.  Love told
Davis that he would not tolerate sexual harassment and informed Conley, the new
district manager, of Williams’s allegations.  Conley asked Williams to put her
complaint in writing.  Love told Griffith to report back to him if she saw any
incident between Williams and Davis.  Waffle House argues that, based on this
evidence (which, according to Waffle House, shows that it took prompt, remedial
action), the jury’s finding is against the great weight and preponderance of
the evidence.

Waffle
House also argues that the great weight and preponderance of the evidence supported
an affirmative finding on the second element of its affirmative defense because
it showed that Williams declined to use procedures that could have aided in
enabling Waffle House to take quick and decisive action.  Waffle House contends
that Williams “knew or should have known that the company policy was that an
employee ‘has not officially reported the [sexually harassing act] until’” the
employee has called the hotline.  Waffle House provides an employee complaint
hotline as part of its sexual harassment policy.  The hotline allows employees
to report complaints to corporate management without going through lower level
managers.  Yet, Waffle House argues, Williams did not immediately call the
hotline, and she never successfully called the hotline on her own.  Based on
this evidence, Waffle House argues that the jury’s finding is against the great
weight and preponderance of the evidence.

We
disagree with Waffle House’s arguments as to both elements. We previously held
that Waffle House “did not take reasonable precautions to prevent interaction
between Williams and Davis in the restaurant,” and our review of the evidence
does not compel us to reach a different conclusion on remand.[76]

Ajene
was the first Waffle House manager to learn of Williams’s problems with Davis. 
Ajene thus knew of the problem although the parties disputed at trial whether
Williams told Ajene herself or whether Ajene was told about it by Griffith (who
had been told about it by Williams).  Ajene spoke to Davis, who denied the
allegations.  Ajene testified at trial that when he spoke to Davis, he was not
sure specifically what Williams’s complaint against Davis consisted of because
Williams would not talk about it with him.

Ajene
nevertheless moved Davis to the second shift, which Ajene testified made Davis
“very mad.”  Ajene testified that he then “kept his eyes open” for any problems
between Davis and Williams during the shift change.  During the nearly eight
months after Davis moved shifts, Williams and Davis worked together a total of
about 18.5 hours, when their shifts overlapped.  Williams testified, however,
that Davis was at the restaurant many times when not on the clock, eating meals
and picking up his pay.

Although
Ajene moved Davis to the second shift, he did not take any steps to ensure that
Davis did not interact with Williams in the restaurant when Davis was not
working or when their shifts overlapped.  Ajene acknowledged in his testimony
that he did not call the hotline, did not report the complaint to Marshall, his
district manager, did not make a written report (although he did once see fit
to write up Davis for his temper), and did not report Williams’s complaint to
anyone at Waffle House, even though he had an obligation to do so under Waffle
House’s sexual harassment policy.

On
cross-examination, Ajene claimed that he had asked Williams about the
harassment on more than one occasion but she always said, “Don’t worry. I’ll
take care of it.”  But he also agreed that the matter was not something that employees
should handle themselves and that Williams was not in any position, other than
calling the hotline, to fix it herself.  Furthermore, Williams denied telling
anyone that she could handle the problem herself, and the jury was entitled to
believe her testimony.[77]
 The jury was also entitled to believe Williams’s testimony that Ajene told her
that he would not move Davis to another store unless Williams found a
replacement for him.

After
Love replaced Ajene, Williams complained to him about Davis’s conduct and told
him that she was still encountering Davis at work.  Love did not investigate
the complaints and did not investigate whether problems were continuing.  He
also did not attempt to ensure that Davis did not interact with Williams in the
restaurant, and at trial, he acknowledged that they still encountered each
other at work.  He told her that there was no way to structure their shifts for
her to avoid her coming into contact with Davis as long as they were both
employed at the same restaurant.  Williams testified that no one ever gave her
the option of transferring her to another store but that she would have taken
that option had it been given to her.

Love
did report the problem to Marshall, his district manager, but he did not follow
up to find out if anything had been done.  And once a new district manager
replaced Marshall, Love did not report Williams’s complaints to him until
Williams threatened to quit.  When Williams quit, Love left a message on her
answering machine in which he stated that they could work it out so that she
would not have to see Davis, but his suggestion was that she come into work
late and leave early.  He also told her that “[t]his puts us in a bad situation
with staffing and it wasn’t our problem.”  Love testified that his suggestion
of changing her schedule did not mean cutting her hours; it meant “being able
to put a schedule together that made her comfortable with continuing to work
with Waffle House.”  He also explained that by telling Williams that her
quitting put the restaurant in a bad position and “wasn’t our problem,” he
meant that “Conley and I were not on board at the beginning of her employment
or [Davis’s] employment, and I, in my mind, wanted the people that were on
board prior to me coming on board to tell me where the situation was because I
had no knowledge.”  The jury, however, did not have to accept these
explanations as true.[78]

Williams
discussed the issue with Marshall, the district manager.  Marshall spoke with
Davis about Williams’s allegations, and again Davis denied them.

Marshall
attempted to call the hotline with Williams after she told him that she had
tried to use the hotline before but worried she had not dialed correctly.  Marshall
did not, however, report to the hotline on his own, did not conduct an
investigation of Williams’s complaints, did not follow up with Williams to
determine if any investigation had been made by Waffle House’s corporate
management, and, importantly, like the other managers involved, did not ensure
that Davis and Williams would have no interaction in the restaurant.

District
manager Conley, who had replaced Marshall, told Williams to write a letter
documenting her claims.  Conley reported Williams’s claim to Kevin Ross, the
divisional manager.  Williams tried to give her letter to Love, who initially
refused to accept it because he thought it should go directly to Conley, even
though Conley was on vacation at the time.  Conley could not remember what he
had done with the letter once he had received it, but he stated that he knew that
he had turned it over to somebody.  Conley did not attempt to ensure that
Williams and Davis had no interaction in the restaurant.  He did not interview
Davis or ask him for a statement.

Although
a call was made to a Waffle House hotline, no investigation was ever made of Williams’s
complaints.  Waffle House argues that Williams called the wrong Waffle House
hotline number, but even if she had, she also reported her complaint to four
different managers, and the evidence shows that none of the managers followed
up with Williams as to whether the complaints were being investigated or whether
the problems were ongoing, ensured that Williams and Davis would have no
interaction on the work premises, or attempted to supervise Davis when he was
in the store off-duty to prevent the type of behavior that Williams reported.

Martha
Hensen, a Waffle House employee, testified that Waffle House made no
investigation of Williams’s complaint because Waffle House had no record of the
call and the complaint was never put into their case management system.  Hensen
is a case manager for Waffle House, and in her job she investigates complaints
of violations of company policy.  She testified that when a message is left on
the hotline voicemail, someone from the office listens to it and writes the
information down on a legal pad.  That person is supposed to then input that
information into the computer.  If a mistake was made on the part of the person
who listened to the message in writing it down or putting it into the computer,
there is no way to go back and find out if a mistake was made.  The jury apparently
believed that this system was not sufficient to show that Waffle House exercised
reasonable care to prevent and promptly correct harassing behavior.

Valencia
Porter, Waffle House’s in-house employment counsel, testified as Waffle House’s
representative.  She stated that no investigation of Williams’s claims was made
by the legal department prior to Waffle House receiving the EEOC complaint
because Waffle House was unaware of the problem before that time.  She stated
that she did not know what happened to the letter Williams gave to Conley. 
Porter also stated that Waffle House had no record of the hotline call made by
Marshall and Williams, which she explained by stating that they may have called
and left a message with Waffle House’s workers’ compensation hotline or some
other Waffle House 1-800 number by mistake.  If they had called the correct
hotline, she “wouldn't know what happened” as to why Waffle House did not
investigate the complaint or have a record of it.

Porter
also testified that because the EEOC complaint had come in while she was on
maternity leave, the complaint had been investigated by Waffle House’s outside
counsel.  Although Porter testified as Waffle House’s representative, she was
not aware of actions that the outside counsel had taken in the investigation.  She
did not know what statements, if any, were taken, including whether Davis,
Marshall, Conley, Love, or Ajene were interviewed, or the content of any
statements that were given.  Porter stated that although each of the managers
had testified that Waffle House did not follow up with them on Williams’s
complaint with an investigation, this did not indicate that they were not
interviewed because “they may not recall being interviewed by our attorney or
they may not realize that’s what you’re talking about when you say follow-up.” 
The jury was free to disagree with Porter’s interpretation of the managers’
testimony.

Furthermore,
the jury may have found inadequate Porter’s suggestion that Williams and
Marshall may have called and left a message with the workers’ compensation
number or other Waffle House number by mistake because even if Williams and
Marshall had done so, they still would have left a message with Waffle House’s
corporate offices, which failed to follow up on the complaint.  Furthermore,
Hensen also testified that every Waffle House manager is required to report
sexual harassment regardless of whether the employee reports it.  In this case,
none of the managers personally reported the harassment to the hotline, and
only Marshall made sure that Williams herself had called the hotline.

Based
on the evidence, the jury’s finding that Waffle House did not exercise
reasonable care to prevent and promptly correct the harassing behavior is not
against the great weight and preponderance of the evidence.

As
for Williams’s actions in using procedures that could have helped Waffle House
to take quick and decisive action—that is, calling the hotline—Waffle House is
correct that Williams did not call the hotline immediately.  But Williams
testified that Ajene had told her not to and that he would handle the problem
himself.  And when she did call the hotline, Waffle House took no action. 
Waffle House argued that she called the wrong number, but even under Waffle
House’s theory—that she had called its workers’ compensation hotline or another
one of Waffle House’s 1-800 numbers—Williams reported sexual harassment to
Waffle House, but no investigation of her complaint was made.  We cannot say
that the jury’s finding on this element is against the great weight and
preponderance of the evidence or that Waffle House established its affirmative
defense as a matter of law.  We therefore overrule this part of Waffle House’s
second issue.

(3) Constructive
Discharge Finding

Waffle
House also argues under its second issue that the jury’s constructive discharge
finding is not supported by legally or factually sufficient evidence.  The jury
was instructed that “[a]n employee is considered to have been constructively
discharged when conditions are so intolerable that a reasonable person in the
employee’s position would have felt compelled to resign.”[79] 
In question two of the charge, the jury answered in the affirmative when asked
if Williams had been constructively discharged from her job at Waffle House.  The
jury also found that the discharge occurred at least in part as a result of an
official action.

Waffle
House first contends that because there was no evidence to support Williams’s
hostile work environment sexual harassment claim, there is no predicate for
constructive discharge, and her claim fails.[80]  Because we have held
that the evidence was sufficient on Williams’s hostile work environment claim,
we reject this argument.

Waffle
House then argues that to show constructive discharge, Williams had to show
“aggravating factors” demonstrating greater severity or pervasiveness of
harassment than the minimum required to prove hostile work environment,
including

(1) demotion; (2) reduction in salary; (3) reduction in
job responsibilities; (4) reassignment to menial or degrading work; . . . [5]
badgering, harassment, or humiliation by the employer calculated to encourage
the employee’s resignation; or [6] offers of early retirement [or continued
employment on terms less favorable than the employee’s former status].[81]

It
contends that Williams was unable to produce a scintilla of evidence on any of
these aggravating factors.  Accordingly, it contends, her constructive discharge
claim fails.

The
United States Supreme Court in Suders did not set out any specific factors
that a plaintiff must show to establish constructive discharge in a
hostile work environment sexual harassment claim.  It merely stated an
objective inquiry:  “Did working conditions become so intolerable that a
reasonable person in the employee’s position would have felt compelled to
resign?”[82]  But the Court did make
clear that a constructive discharge claim “entails something more” than what is
required to establish a hostile work environment claim; whereas a hostile work
environment sexual harassment claim is established by showing that “harassing
behavior ‘sufficiently severe or pervasive to alter the conditions of [the
plaintiff’s] employment,’” a constructive discharge claim requires a further
showing that “the abusive working environment became so intolerable that her
resignation qualified as a fitting response.”[83]  The factors listed by
Waffle House are factors that the Fifth Circuit considers relevant to constructive
discharge,[84] and we agree that they have
relevance, particularly in determining whether an official act underlies the
constructive discharge.[85]  But we disagree that an
employee may not prove constructive discharge without establishing these factors.[86]
 If the employee shows that, considering the circumstances, a reasonable person
in the employee’s position would have felt compelled to resign, the employee
has met her burden of proof.[87]

In
this case, Williams testified that she reported Davis’s behavior to four
managers, and this testimony was corroborated by the managers themselves. 
Williams also testified that she and Marshall called the Waffle House hotline. 
Whether or not they mistakenly called the wrong Waffle House number, it is
undisputed that no action was ever taken in response to the phone call,
whichever Waffle House telephone line received the message, and that none of
her managers followed up with Waffle House corporate offices or with Williams to
find out if an investigation was underway.  Love was aware that Williams was
considering quitting based on Waffle House’s lack of response to her complaints,
yet he never followed up with anyone to see if Waffle House’s upper management
was in fact investigating.  All the while, Davis’s behavior continued unabated—behavior
that we have already held was sufficient to demonstrate a hostile work
environment.  And after Davis was told of her complaints, his behavior became
more hostile.  Yet Waffle House did not offer to transfer Williams to another store,
and Love told Williams that there was no way to structure their shifts so as to
avoid her coming into contact with Davis as long as they were both employed at
the same restaurant.  To a reasonable person in Williams’s position, it would
appear that no matter how many times she reported, in what manner she reported,
or to whom she reported, nothing would change, despite Davis’s continued
harassment and escalating hostility.  Applying the appropriate standards of
review, we hold that the evidence was both legally and factually sufficient for
a jury to find that a reasonable person in Williams’s position would have felt
compelled to resign.[88]

Waffle
House further contends under this argument that “prompt remedial action is
fatal to a claim of constructive discharge.”  We note that whether Waffle House
was entitled to assert the affirmative defense to Williams’s claim of
constructive discharge has not been specifically addressed by the United States
Supreme Court.  The Court in Suders expressly declined to set out a
standard for employer liability for co-worker harassment, as was alleged in
this case, although it recognized that “harassment so intolerable as to cause a
resignation may be effected through co-worker conduct.”[89]  But applying the rationale
of the Court in that opinion, Waffle House was entitled to assert the
affirmative defense to Williams’s constructive discharge claim if Williams’s
decision to resign was in response to an employer-sanctioned adverse employment
action.[90] 
In this case, the jury found that the constructive discharge was precipitated
by official action, in which case, under the United States Supreme Court’s
reasoning in Suders, the affirmative defense was not available to Waffle
House.  But we need not decide the standard to apply in coworker harassment
constructive discharge claims here because, as discussed above, the jury found
against Waffle House on its affirmative defense.  We therefore reject Waffle
House’s contention that its actions in response to Williams’s complaints defeat
her constructive discharge claim.

Because
the evidence was sufficient to support the jury’s finding that Williams had
been constructively discharged, we overrule the part of Waffle House’s second
issue relating to constructive discharge.

B. 
Jury’s Finding on Malice or Reckless Indifference

Finally,
Waffle House also argues under this issue that the jury’s “malice or reckless
indifference” finding is not supported by legally or factually sufficient
evidence.  Section 21.2585 of the labor code provides that a plaintiff may
recover punitive damages from a defendant who engaged in an unlawful
intentional employment practice if the plaintiff demonstrates that the
defendant engaged in the discriminatory practice with malice or with reckless
indifference to the state-protected rights of the plaintiff.[91]

We
addressed Waffle House’s sufficiency argument in our previous opinion.[92] 
Waffle House argues that we should reconsider its arguments because in the
prior appeal “the only punitive damages before [this court] were those
predicated on the negligence findings, . . . and [this court]
did not address the issue of whether Williams’[s] alternative trial theories
could support the judgment.”

The
jury was not asked to make separate “malice or reckless indifference” findings
for the sexual harassment claim and the negligence claim; the question asked
whether the jury found clear and convincing evidence that Waffle House engaged
in the conduct asked about in previous questions (including sexual harassment)
with malice or reckless indifference to Williams’s right to be free from such
conduct.  And our previous analysis of the evidence supporting the finding was
not premised on the jury’s finding of negligence.  Our previous analysis is
equally applicable to Williams’s statutory sexual harassment claim, and we see
no need to re-examine it here.  We incorporate our previous analysis and our holding
that “the evidence presented is such that the jury could have reasonably formed
a firm belief or conviction that the failure to act by Waffle House managers
created an extreme degree of risk to Williams and showed a conscious
indifference to Williams’s rights, safety, or welfare.”[93] 
We overrule this part of Waffle House’s second issue.  Having overruled all of
Waffle House’s subarguments, we overrule Waffle House’s second issue.

The
jury awarded Williams $400,000 for past compensatory damages, $25,000 for
future compensatory damages, and $3,460,000 in punitive damages.  Section
21.2585(d) of the labor code, however, caps the amount of compensatory damages
that may be awarded for a claim made under that chapter, including punitive
damages.  Under the cap applicable in this case, Williams could not be awarded
more than $300,000.  Williams did not argue to the trial court or on appeal
that the cap does not apply.

Accordingly,
we modify the trial court’s judgment to delete the punitive damages award and
reduce the award of total compensatory damages to $300,000.

IV. 
Conclusion

Having
overruled Waffle House’s issues, and having modified the trial court’s judgment
to award Williams total compensatory damages of $300,000, we affirm the trial
court’s judgment as modified regarding those damages and to the extent that it
adopts the jury’s findings on the TCHRA claim and awards $4,728.60 in taxable court
costs, prejudgment interest of five percent per annum calculated from November
2, 2002 until July 29, 2005, and postjudgment interest at the rate of five
percent per annum on the total amount of the final judgment less prejudgment
interest, compounded annually, beginning July 30, 2005, until fully paid.  But
because neither the trial court nor the jury made findings respecting
Williams’s attorney’s fees and expert costs, which the trial court may award to
the prevailing party in a claim under the TCHRA,[94]
and because the amounts of prejudgment and postjudgment interest will need to
be recalculated, we reverse the trial court’s judgment as to these matters and remand
this case to the trial court for determination of the issues of (1) attorney’s
fees, (2) expert costs, (3) the amount of prejudgment interest of five percent
per annum calculated from November 2, 2002 until July 29, 2005, and (4) the
amount of postjudgment interest, based on the total amount of the final
judgment less prejudgment interest, and calculated at five percent per annum,
compounded annually, beginning July 30, 2005, until fully paid.

 

 

LEE ANN DAUPHINOT
JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and MCCOY, JJ.

 

DELIVERED: 
August 25, 2011









[1]See Tex. R. App. P. 47.4.





[2]Waffle House, Inc. v. Williams, 314
S.W.3d 1 (Tex. App.—Fort Worth 2007) (Waffle House I), rev’d, 313 S.W.3d 796 (Tex. 2010) (Waffle House II).





[3]Tex.
Lab. Code Ann. §§ 21.001–.556 (West 2006).





[4]Waffle
House II, 313 S.W.3d at 813.





[5]Tex.
Lab. Code Ann. §§ 21.001–.556.





[6]Waffle
House I, 314 S.W.3d at 9.





[7]Id.
at 11.





[8]Id.
at 15.





[9]Waffle
House II, 313 S.W.3d at 813.





[10]Id.





[11]City
of Watauga v. Taylor, 752 S.W.2d 199, 205 (Tex. App.—Fort Worth 1988, no
writ) (stating that attorney’s fees are not recoverable under a negligence
claim); Shenandoah Assocs. v. J & K Props., Inc., 741 S.W.2d 470,
486 (Tex. App.—Dallas 1987, writ denied) (stating general rule that expenses
incurred in prosecuting a suit are not recoverable as costs unless recovery is
provided for by statute); Whitley v. King, 581 S.W.2d 541, 544 (Tex.
Civ. App.—Fort Worth 1979, no writ) (stating that “costs of experts are ‘merely
incidental expenses in preparation for trial and not recoverable’”); cf.
Tex. Lab. Code Ann. § 21.259(c) (providing that the trial court may in its
discretion award expert fees in an action under the TCHRA).





[12]City of Watauga, 752 S.W.2d at 205; Shenandoah Assocs., 741 S.W.2d at 486.





[13]747 S.W.2d 785, 787 (Tex. 1988).





[14]Id. at 786.





[15]Id.





[16]Id. at 786–87.





[17]Id. at 787.





[18]Id.





[19]Id.
at 787.





[20]Id.





[21]Id.





[22]Hoover Slovacek LLP v. Walton, 206
S.W.3d 557, 566 n.9 (Tex. 2006).





[23]DiGiuseppe v. Lawler, 269 S.W.3d 588,
603 (Tex. 2008) (discussing Boyce) (emphasis added).





[24]Id.





[25]See
id. at 603.





[26]See Hoover Slovacek LLP, 206 S.W.3d at
566 n.9.





[27]See Commonwealth Lloyds Ins. Co. v.
Downs, 853 S.W.2d 104, 109 (Tex. App.—Fort Worth 1993, writ denied)
(allowing the appellee to challenge the trial court’s failure to award
alternative relief in its judgment by requesting in his prayer that the
judgment be affirmed or, alternatively, modified, even
though he had not brought a crosspoint on that issue).





[28]Id.





[29]Id.





[30]Id.





[31]Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).





[32]Cent. Ready Mix Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).





[33]Pool v. Ford Motor Co., 715 S.W.2d
629, 635 (Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821,
823 (Tex. 1965).





[34]Tex. Lab. Code Ann. § 21.051; Herbert v. City of Forest Hill,
189 S.W.3d 369, 374–75 (Tex.
App.—Fort Worth 2006, no
pet.) (noting that because the Texas Legislature adopted
labor code chapter 21 for the express purpose of carrying out the policies of Title
VII of the federal Civil Rights Act of 1964 and its amendments, “when reviewing
an issue in a proceeding brought under chapter 21, we may look . . .  to cases
interpreting the analogous federal provisions”); see also Hoffmann-La Roche
Inc. v. Zeltwanger, 144 S.W.3d 438, 446 (Tex. 2004) (stating that federal
case law may be cited as authority in cases relating to the TCHRA).





[35]Tex.
Lab. Code Ann. § 21.051.





[36]Cox v. Waste Mgmt. of Tex., Inc., 300
S.W.3d 424, 432 (Tex. App.—Fort
Worth 2009, pet. denied).





[37]Burlington
Indus., Inc. v. Ellerth, 524 U.S. 742, 751–53, 118 S. Ct. 2257, 2264
(1998).  To the extent that the opinion in Wal-Mart Stores, Inc. v. Itz
from our sister court of appeals can be read to suggest that a quid pro quo claim
is any sexual harassment claim in which a tangible employment action has been
alleged, we disagree.  See 21 S.W.3d 456, 470 (Tex. App.—Austin 2000,
pet. denied) (stating that the elements of a quid pro quo sexual harassment
claim are that “(1) [a] supervisor (2) because of sex (3) subjects an employee
to (4) unwelcome conduct that (5) affects a tangible aspect of the employment
relationship” and citing Ellerth).  A hostile work environment claim may
also involve a tangible employment action.  See Pa. State Police v. Suders,
542 U.S. 129, 143, 124 S. Ct. 2342, 2352 (2004).





[38]Ellerth,
524 U.S. at 751–53, 118 S. Ct. at 2264.





[39]Id.





[40]Id.
at 752, 753–54, 118 S. Ct. at 2264, 2265 (“When a plaintiff proves
that a tangible employment action resulted from a refusal to submit to a
supervisor’s sexual demands, he or she establishes that the employment decision
itself constitutes a change in the terms and conditions of employment.”).





[41]Id.
at 751–52, 118 S. Ct. at 2264.





[42]Id.





[43]Id.
at 751–52, 754, 118 S. Ct. at 2264, 2265 (stating that “[t]he terms quid
pro quo and hostile work environment are helpful, perhaps, in making a
rough demarcation between cases in which threats are carried out and those
where they are not or are absent altogether, but beyond this are of limited
utility” and that the factors discussed in the opinion “and not the categories quid
pro quo and hostile work environment” control on the issue of vicarious
liability).





[44]See
id. at 760, 764, 118 S. Ct. at 2268, 2270.





[45]Meritor
Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)
(quoting Henson v. Dundee, 682 F.2d 897, 902 (11th Cir. 1982)).





[46]Harris v. Forklift Sys., Inc., 510 U.S.
17, 22, 114 S. Ct. 367, 370–71 (1993); see also Herbert, 189 S.W.3d at
374–75.





[47]Suders,
542 U.S. at 143, 124 S. Ct. at 2352.





[48]Id.





[49]Ellerth,
524 U.S. at 760, 761, 118 S. Ct. at 2268.





[50]Ellerth,
524 U.S. at 759–62, 118 S. Ct. at 2268, 2269; see also Suders,
542 U.S. at 143, 124 S. Ct. at 2352.





[51]Ellerth,
524 U.S. at 765, 118 S. Ct. at 2270; Faragher v. City of Boca Raton, 524
U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998).





[52]Faragher,
524 U.S. at 807, 118 S. Ct. at 2293.





[53]Suders,
542 U.S. at 147, 124 S. Ct. at 2354.





[54]Id.
at 140, 146, 124 S. Ct. at 2351, 2354 (stating that the constructive discharge
at issue in that case as stemmed from and could be regarded as “an aggravated
case[] of sexual harassment or hostile work environment”).





[55]Id. at 143, 124 S. Ct. at 2352.





[56]Id. at 141, 148,
124 S. Ct. at 2351, 2355; see also Aryain v.
Wal-Mart Stores Tex. LP, 534 F.3d 473, 480 (5th Cir. 2008) (stating that
“[i]n certain circumstances, a constructive discharge can be considered a
tangible employment action that precludes an employer from asserting” the
affirmative defense established under United States Supreme Court case law); Cox,
300 S.W.3d at 433 (noting that “[a]
constructive discharge may qualify as a tangible employment action”
(emphasis added)).  But
see Waffle House II, 313 S.W.3d at 805 (citing Suders
and stating without qualification that “[a] constructive discharge qualifies as
an adverse personnel action under the TCHRA”).





[57]Suders, 542 U.S. at 148, 124 S. Ct. at
2355.





[58]Id.





[59]Id.





[60]Meritor Sav. Bank, 477 U.S. at 67, 106 S. Ct. 2405; Zeltwanger, 144 S.W.3d at 445 n.5; see also Ellerth, 524
U.S. at 754, 118 S. Ct. at 2265.





[61]Harris, 510 U.S. at 21, 114 S. Ct. at 370.





[62] Itz, 21 S.W.3d at 472.





[63]Id.; see also Harris, 510 U.S. at
23, 114 S. Ct. at 371.





[64]Harris, 510 U.S. at 23, 114 S. Ct. at
371; Itz, 21 S.W.3d at
472.





[65]Wal-Mart Stores, Inc. v. Davis, 979
S.W.2d 30, 42 (Tex. App.—Austin
1998, pet. denied); see also Harris, 510 U.S. at 21–22, 114 S. Ct. at 370.





[66]Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998) (noting that the
“objective severity of harassment should be judged from the perspective of a
reasonable person in the plaintiff’s position, considering ‘all the
circumstances’”).





[67]See
In re R.W., 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied)
(stating that the factfinder’s function “is to judge the credibility of the
witnesses, assign the weight to be given their testimony, and resolve any
conflicts or inconsistencies in the testimony”); see also State Farm Fire
& Cas. Co. v. Rodriguez, 88 S.W.3d 313, 321 (Tex. App.—San Antonio
2002, pet. denied) (“It is fundamental that a jury may blend the evidence
admitted before it and believe all, some[,] or none of a witness’s
testimony.”), abrogated on other grounds by Don’s Bldg. Supply, Inc. v.
OneBeacon Ins. Co., 267 S.W.3d 20, 26–27 (Tex. 2008).





[68]We question the relevancy of Waffle
House’s counsel’s question to Williams at trial
about whether she was actually trapped by Davis because,
“Well, you could have just crawled
over the table, couldn’t you, if you really needed to?”





[69]See
Tex. R. Civ. P. 176.6 (requiring a person who has been served with a subpoena
to comply with it).





[70]Waffle House II, 313 S.W.3d at
813 (describing evidence of Williams’ “general sexual proclivities” as
“prejudicial” and stating that “its probative value as to whether Williams
welcomed sexual advances from Davis strikes us as marginal”); Waffle House I, 314 S.W.3d at 18 (holding that the trial court’s belief that the testimony had
no relevance other than to unfairly prejudice the jury was not arbitrary or
unreasonable).





[71]See, e.g., Norwich Union Indem. Co.
v. Smith, 12 S.W.2d 558, 562 (Tex. Comm’n App. 1929, judgm’t adopted) (stating
that generally the testimony of one witness, if
believed by a jury, is sufficient evidence to establish a controverted fact); see
also Dillard Dep’t Stores, Inc. v. Gonzales, 72 S.W.3d 398, 401 (Tex. App.—El Paso 2002, pet. denied)
(upholding favorable jury verdict on sexual harassment claim in a case
characterized by the court as “a swearing-match” and noting that the jury was
free to reject any or all of the testimony).





[72]See City of Waco v. Lopez, 259 S.W.3d
147, 151 n.3 (Tex. 2008); Cox, 300 S.W.3d at 435.





[73]See Lopez, 259 S.W.3d at 151 n.3; Cox, 300 S.W.3d at 435.





[74]Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270 (putting burden on employer
to establish this affirmative defense); see also Garner v.
Fidelity Bank, N.A., 244 S.W.3d 855, 861 (Tex. App.—Dallas 2008, no pet.)
(stating that party asserting affirmative defense bears the burden of proving
it).





[75]See Dow Chem. Co. v. Francis, 46
S.W.3d 237, 241 (Tex. 2001); Cropper
v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); see also
Gonzalez v. McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681–82 (Tex. 2006).





[76]Waffle House I, 314 S.W.3d at 11.





[77]See
R.W., 129 S.W.3d at 738.





[78]See
id.





[79]See Baylor Univ. v. Coley, 221 S.W.3d
599, 603, 605 (Tex. 2007)
(stating that a jury is correctly instructed on constructive discharge when
told that “[a]n employee is considered to have been discharged when an
employer makes conditions so intolerable that a reasonable person in the
employee’s position would have felt compelled to resign” (emphasis added)).  Waffle House does not argue that because of the slight difference in wording between the charge in this case and the charge in Coley, the charge in this case was an incorrect
statement of the law, and we are therefore not called upon to consider the
question.  See Suders, 542 U.S. at 141, 124 S. Ct. at 2351 (stating that
the question was whether “working conditions [had] become so intolerable that a
reasonable person in the employee’s position would have felt compelled to
resign” and not specifying that it must be the employer who causes the
intolerable conditions).  We comment on the difference
only to acknowledge its existence and not to assign it any weight or
significance.





[80]See Suders, 542 U.S. at 149,
124 S. Ct. at 2356 (“Creation of a hostile work environment is a necessary
predicate to hostile-environment constructive discharge case.”).





[81]Cox, 300 S.W.3d at 433–34 (quoting Brown
v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir.), cert. denied,
534 U.S. 817, 122 S. Ct. 45 (2001)).





[82]Suders, 542 U.S. at 141, 124 S. Ct. at
2351; see also City of Fort Worth v. DeOreo, 114 S.W.3d 664, 677
(Tex. App.—Fort Worth 2003,
no pet.).





[83]Suders, 542 U.S. at 133–34, 124 S. Ct. at 2347.





[84]Barrow v. New Orleans S.S. Ass’n, 10
F.3d 292, 297 (5th Cir. 1994) (noting that “whether a reasonable employee would
feel compelled to resign depends on the facts of each case” but that it
considered the enumerated factors relevant to that determination); see also
Cox, 300 S.W.3d at 433–34 (noting that the Fifth
Circuit has considered those factors in determining a constructive discharge
claim).





[85]See Suders, 542 U.S. at 148, 124 S. Ct. at 2355 (stating that “when an official act does not
underlie the constructive discharge,” the Ellerth/Faragher
affirmative defense may be asserted by the employer).





[86]See, e.g., id. at 148, 124 S.
Ct. 2355 (stating that “harassment so intolerable as to cause a resignation may
be effected through co-worker conduct” (emphasis added)).





[87]Id. at 141, 124 S. Ct. at 2351.





[88]See Gonzales, 72 S.W.3d at 410 (holding that under the evidence, it was reasonable for a jury
to conclude that the plaintiff had been constructively discharged “in that he felt he had no alternative but”
to remain in the department and endure the harassment in order to keep his job
when the harassment continued after the plaintiff’s complaint and the
initiation of an investigation, the plaintiff was never informed of the results
of any investigation, and he was refused a transfer).





[89] Suders, 542 U.S. at 143 n.6, 148, 124 S. Ct. at 2352 n.6, 2355.





[90]Id. at 134, 148–49, 124 S. Ct. at 2347, 2355 (noting that absent an official act of the employer, “the
employer ordinarily would have no particular reason to suspect that a
resignation is not the typical kind daily occurring in the work force,” and
“the extent to which the supervisor’s misconduct has
been aided by the agency relation . . . is less certain,” and therefore the
employer should be afforded the chance to establish the affirmative defense in
the absence of an official action leading to the employee’s decision to
resign).





[91]Tex.
Lab. Code Ann. § 21.2585(a),(b).





[92]See Waffle House I, 314 S.W.3d at 20–22.





[93]Waffle
House I, 314 S.W.3d at 22.





[94]Tex.
Lab. Code Ann. § 21.259(a), (c).